# 23-7571-cv

## United States Court of Appeals
### for the
## Second Circuit

LOUIS PETERS, Derivatively on Behalf of Nominal Defendant Eastman
Kodak Company, HERBERT SILVERBERG, Derivatively on Behalf
of Nominal Defendant Eastman Kodak Company,

*Plaintiffs-Appellants,*

– v. –

JAMES V. CONTINENZA, DAVID E. BULLWINKLE,
ROGER W. BYRD, RICHARD TODD BRADLEY, GEORGE KARFUNKEL,
PHILLIPE D. KATZ, JASON NEW, RANDY VANDAGRIFF,

*Defendants,*

EASTMAN KODAK COMPANY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (ROCHESTER)

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

LEE D. RUDY
ERIC L. ZAGAR
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

– and–

HADLEY E. LUNDBACK
FARACI LANGE, LLP
1882 South Winton Road, Suite 1
Rochester, New York 14618
(585) 325-5150

*Attorneys for Plaintiffs-Appellants*



## <u>TABLE OF CONTENTS</u>

<u>Page</u>

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................1

STATEMENT OF THE CASE.........................................................................2

SUMMARY OF ARGUMENT .........................................................................3

STATEMENT OF FACTS ..............................................................................7

    A.    Continenza Joins Kodak And Becomes Executive Chairman ..............7

    B.    Continenza Has A Long-Standing Business And Attorney-Client Relationship With Akin Gump.........................................................7

        1.    Continenza Had A Long-Standing Relationship With Akin Gump Before Becoming Kodak's Executive Chairman.................................................................................7

        2.    Akin Gump Acted As Continenza's Personal Counsel ..............8

        3.    Continenza Introduces Akin Gump To Kodak .........................16

    C.    Kodak Explores A Transformative Business Shift And Seeks A Government Loan.........................................................................17

    D.    Kodak's Project Tiger Gains Steam....................................................19

    E.    Continenza Buys Kodak Shares and Awards Bonuses To The Project Tiger Team.........................................................................20

    F.    Kodak Submits Its Transformative DFC Loan Application ...............21

    G.    The DFC Reviews Kodak's Loan Application And Works Jointly With Kodak On A Public Announcement................................21

    H.    Kodak's Board Awards Nearly 2 Million Stock Options One Day Before Announcing The DFC LOI............................................22

    I.    Kodak Announces The LOI And Kodak's Stock Price Skyrockets ...................................................................................23

    J.    Kodak Discloses The Springloaded Options And Hires Akin Gump In The Face Of Public Scrutiny..................................................23

    K.    Kodak Forms The Special Committee, Which Hires Akin Gump ...................................................................................24

i

L.  Stockholders Serve Litigation Demands And File Securities Class Actions ..................................................................26

M.  Akin Gump Enters Its Appearance On Behalf Of Continenza In The *Tang* Action ..................................................26

N.  Akin Gump Prepares And Delivers The SC Report ...........27

O.  The NYAG Exposes Undisclosed Facts .............................28

P.  Kodak Attempts A Do-Over ...............................................28

Q.  Relevant Procedural History ..............................................30

ARGUMENT .............................................................................................30

I.  The District Court Applied The Wrong Legal Standard .................30

A.  The District Court Properly Decided Defendants' Motion As A Motion For Summary Judgment .....................................30

B.  The District Court Erred By Applying The Wrong Standard In Evaluating Defendants' Summary Judgment Motion .......32

C.  The District Court Erred In Failing To Resolve Ambiguities And Make Proper Inferences In Plaintiffs' Favor ..............33

II.  Plaintiffs Raised A Genuine Issue As To The Good Faith And Reasonableness Of The Special Committee's Investigation ...........35

A.  Plaintiffs Raised A Genuine Issue As To Akin Gump's Independence ......................................................................35

1.  Continenza Had A Long-Term Relationship With Akin Gump ..................................................................36

2.  Akin Gump Acted As Continenza's Personal Attorney ..........38

3.  Continenza Caused Kodak To Retain Akin Gump On July 29, 2020 In Part To Protect His Personal Interests ..........41

4.  The Totality Of The Allegations Raise A Genuine Issue As To Akin Gump's Independence ...........................44

B.  Plaintiffs Raised A Genuine Issue As To The Reasonableness Of Akin Gump's Investigation ..................45

1.  Akin Gump Falsely Concluded That Continenza Had "Pre-Cleared" His June Trades In Compliance With Company Policy ..................................................46

ii

2.   Akin Gump Ignored Facts In Concluding That Continenza Did Not Have MNPI When He Made The June Trades ...................................................................48

III.   The Second Committee's Report Does Not Cleanse Akin Gump's Conflicts.................................................................................49

CONCLUSION ...........................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...............................................................34

*Beam v. Stewart*,
845 A.2d 1040 (Del. 2004) ...................................................50

*Brandon v. Kinter*,
938 F.3d 21 (2d Cir. 2019) ......................................32, 34, 41

*Delaware Cty. Emps' Ret. Fund v. Sanchez*,
124 A.3d 1017 (Del. 2015) ...................................................44

*In re Eastman Kodak Co.*,
No. 12-10202, 2012 WL 2255719 (Bankr. S.D.N.Y. June 15,
2012) .....................................................................................17

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) ...................................................35

*George Leon Family Tr. v. Coleman*,
No. 12-cv-4401 (JAP), 2014 WL 2889741 (D.N.J. June 25, 2014)..................50

*Halebian v. Berv*,
548 Fed. Appx. 641 (2d Cir. 2013)................................*passim*

*Halebian v. Berv*,
644 F.3d 122 (2d Cir. 2011) .................................................31

*Johnson v. Hui*,
811 F. Supp. 479 (N.D. Cal. 1991).......................................37

*Johnson v. Killian*,
680 F.3d 234 (2d Cir. 2012) ........................................5, 34, 36, 40

*Lewis v. Fuqua*,
502 A.2d 962 (Del. Ch. 1985) ......................................37, 44, 50

iv

*London v. Tyrrell*,
  No. 3321-CC, 2010 WL 877528 (Del. Ch. Mar. 11, 2010)................................51

*In re PSE&G S'holder Litig.*,
  801 A.2d 295 (N.J. 2002) ...........................................................*passim*

*Standard General Master Fund L.P. v. White Energy Holdco, LLC*,
  No. 2017-0561-JRS (Del. Ch. 2017) ...........................................*passim*

*Tang v. Eastman Kodak Co., et al.*,
  Civil Action No. 3:20-cv-10462-FLW-ZNQ (D.N.J.) ...............................*passim*

**Statutes**

15 U.S.C. § 78aa ........................................................................1

28 U.S.C. § 1291 .......................................................................1

28 U.S.C. § 1331 .......................................................................1

28 U.S.C. § 1367(a) ...................................................................1

Securities Exchange Act of 1934.................................................1

N.J.S.A. § 14A:3-6.3...........................................................*passim*

Private Securities Litigation Reform Act....................................1

**Rules**

Fed. R. Civ. P. 56 ..............................................................*passim*

Fed. R. Civ. P. 12(b)(6)....................................................31, 32

Fed. R. Civ. P. 14a-3 .................................................................1

Fed. R. Civ. P. 14a-9.................................................................1

## JURISDICTIONAL STATEMENT

The United States District Court for the Western District of New York (the "District Court") had federal question jurisdiction over this action (the "Action") pursuant to 28 U.S.C. § 1331 and § 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) (the "Exchange Act") because the Action arises under federal law. Plaintiffs plead violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), as amended by the Private Securities Litigation Reform Act, and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), in addition to violations of Rule 14a-3 and Rule 14a-9, promulgated under Section 14(a) of the Exchange Act (15 U.S.C. § 78n). The District Court had supplemental jurisdiction over the non-federal claims asserted in this Action pursuant to 28 U.S.C. § 1367(a).

On September 26, 2023, the District Court entered summary judgment on all of Plaintiffs' claims in favor of Nominal Defendant Eastman Kodak Company ("Kodak" or the "Company"). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because the appeal is from a final judgment that disposes of all claims with respect to the parties. Plaintiffs timely filed a notice of appeal on October 25, 2023.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The central issue is whether the District Court committed reversible error when it granted summary judgment in favor of Kodak. This issue involves the

following sub-issues:

1.    Whether the District Court committed reversible error when it made findings of fact with respect to whether the Board's decision not to pursue the claims in the Action was made in good faith and after conducting a reasonable inquiry.

2.    Whether the District Court committed reversible error when it failed to grant all reasonable inferences in favor of the non-moving party.

## STATEMENT OF THE CASE

Plaintiffs are stockholders of Kodak who seek to prosecute derivative claims against certain members of Kodak's board of directors and management who engaged in insider trading and other stock schemes to advantage themselves at the expense of the Company.  Kodak filed a motion to dismiss ("Motion") under Section 14A:3-6.5 of the New Jersey Business Corporation Act (the "NJ Statute") arguing that Plaintiffs lack standing to bring the Action.  In a Decision and Order dated September 25, 2023 ("Opinion"), the District Court (Wolford, C.J.) correctly held that the Motion should be considered under Fed. R. Civ. P. 56, but then misapplied the law by making "findings" that drew unreasonable inferences in Defendants' favor.  Had the District Court correctly applied the law, it would have found that Plaintiffs' well-pled allegations created at least two genuine issues of material fact that should not have been resolved against Plaintiffs on Defendants' Motion.

The District Court's Opinion should be reversed, and the Action should be

2

remanded for further proceedings.

## SUMMARY OF ARGUMENT

In the first few months of the pandemic, Kodak was poised to receive a transformative $765 million loan from the federal government to manufacture drug components. Kodak predicted that the loan would allow Kodak to realize profits of $150 million per year. But Kodak never got the loan. The government delayed, and then never granted, the loan after news broke that Kodak's Chief Executive Officer ("CEO") James Continenza ("Continenza") had engaged in insider trading while the loan was pending, and had caused Kodak to grant him nearly 2 million stock options (the "Springloaded Options") the day before the loan was announced.

Plaintiffs brought derivative claims against Continenza and the other Kodak officers and directors who engineered this blatant money-grab that ended up costing the Company the transformative federal loan. The Company's Motion relied on a summary procedure under the NJ Statute that can terminate derivative litigation if properly performed. The procedure allows a corporation to terminate derivative litigation if the board of directors conducts a reasonable, independent investigation, and concludes in good faith that pursuing the derivative claims is not in the best interests of the company.

Kodak's board of directors (the "Board") formed a committee of directors (the "Special Committee" or "SC") to investigate Plaintiffs' claims against Continenza.

3

The Special Committee hired a law firm—Akin Gump Strauss Hauer & Feld LLP ("Akin Gump")—with longstanding ties to Continenza. Akin Gump conducted the entire investigation, and produced a report (the "SC Report") that recommended Kodak not pursue any claims against Continenza or others. On the basis of the SC Report, Kodak filed the Motion.

In granting Defendants' Motion, the District Court erred in determining that Akin Gump had conducted an independent, reasonable, good faith investigation.

***First***, the District Court committed multiple legal errors in how it applied the Rule 56 standard in evaluating Plaintiffs' allegations. Rule 56 did not require ***Plaintiffs*** to prove that Akin Gump had failed to conduct an independent, reasonable, good faith investigation. In *Halebian v. Berv*, 548 Fed. Appx. 641 (2d Cir. 2013) ("*Halebian VI*"), this Court instructed trial courts how to consider applications to terminate derivative litigation, under a Massachusetts statute substantively identical to the NJ Statute:

> In contrast to a typical summary judgment motion, a shareholder-plaintiff is not required to adduce evidence; ***he need only allege particularized facts that raise a genuine issue as to the Trustees' independence, good faith, or reasonable investigation.***

*Halebian VI*, 548 Fed. Appx. at 643 (emphasis added).

The District Court misapplied this standard. The well-pled allegations in Plaintiffs' Corrected Verified Consolidated Stockholder Derivative Complaint

("Complaint") about Akin Gump's longstanding relationship with Continenza at the very least raised a "genuine issue" as to Akin Gump's independence. Plaintiffs' well-pled allegations that Akin Gump had ignored, buried, and mischaracterized material facts were also sufficient to raise a "genuine issue" as to whether Akin Gump conducted a reasonable, good faith investigation. These allegations required the District Court to deny Defendants' Motion.

The District Court also erred in its application of Rule 56 by failing "to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). Instead, in making its improper factual determinations, the District Court resolved virtually all ambiguous facts and drew all factual inferences in favor of the moving party—Defendants.

**_Second_**, these failures by the District Court to follow the clear legal principles established by this Court in *Halebian VI* and *Johnson* manifested themselves in several entirely erroneous factual determinations. Most significantly, the evidence presented by Plaintiffs creates, at a minimum, a genuine issue of material fact as to whether Akin Gump was legally capable of performing an "independent" investigation into Continenza's potential misconduct, because **_Akin Gump was Continenza's personal legal counsel_** and had a long history of advising companies where Continenza was in a leadership role. The Complaint details how in 2017,

5

Continenza "admit[ted]" in a court filing that "Akin Gump represented Mr. Continenza." Continenza caused Kodak to hire Akin Gump the day the news broke about his stock trades. Akin Gump then represented Continenza personally when a securities class action was filed accusing him of fraud. Akin Gump also had a strong financial incentive to go easy on Continenza: Kodak was one of *nine* corporate boards chaired by Continenza that hired Akin Gump since 2013. In light of all these inter-connections, Akin Gump was not legally capable of conducting an independent, reasonable, good faith investigation into Continenza's alleged misconduct.

Relatedly, Plaintiffs' allegations created a genuine issue of material fact regarding whether Akin Gump conducted a reasonable, good faith investigation. The Complaint outlines how Akin Gump ignored material facts in preparing the SC Report, drew unreasonable inferences from the facts it disclosed, and, in at least one instance, blatantly misrepresented the actual facts.

Plaintiffs would have had no idea that Akin Gump had taken these liberties in drafting the SC Report, if not for the intervention of the New York Attorney General's Office ("NYAG"), which had opened a securities fraud investigation (the "NYAG Action") into Continenza's June 2020 purchases of Kodak stock (the "June Trades"). In June 2021, the NYAG filed a motion seeking leave to take Continenza's deposition (the "Ex Parte Application"), which disclosed certain nonpublic facts it

had uncovered. These facts demonstrated that Akin Gump had buried certain facts and mischaracterized others in the SC Report. Defendants' Motion therefore should also have been denied because Akin Gump failed to conduct a reasonable, good faith investigation.

The District Court's Order should be reversed, and this meritorious Action should be remanded for further proceedings.

## STATEMENT OF FACTS

### A.  Continenza Joins Kodak And Becomes Executive Chairman

Kodak was a company on its last legs in early 2019. Its market capitalization was only $100 million, and its continued viability was in severe doubt. A-285. So dire were Kodak's circumstances in 2019, that on April 1, 2019, the Company disclosed a "going concern" qualification in its Form 10-K. A-285-286. Similar going concern qualifications were included in each of Kodak's subsequent annual reports. A-286. It was in this environment that Continenza, who had been the Chairman of Kodak's Board since September 2013, was made Kodak's Executive Chairman with CEO responsibilities in February 2019. A-285.

### B.  Continenza Has A Long-Standing Business And Attorney-Client Relationship With Akin Gump

#### 1.  Continenza Had A Long-Standing Relationship With Akin Gump Before Becoming Kodak's Executive Chairman

Before he became Kodak's Executive Chairman in 2019, Continenza already had a long history of working with Akin Gump. A-682-687. In all, since 2013,

Continenza chaired thirteen corporate boards; those boards hired Akin Gump **nine** times.[1]

### 2. Akin Gump Acted As Continenza's Personal Counsel

The most significant of Continenza's prior involvements with Akin Gump was in connection with White Energy, where Continenza became the board chairman in July 2016. A-118-119. Continenza retained Akin Gump as his personal counsel in negotiations with the White Energy board of directors regarding his compensation package, and later allegedly injected Akin Gump into the White Energy board's consideration of an inquiry from a potential buyer. A-40-41, A-47; A-114-115, A-121.

In October 2017, one of White Energy's largest stockholders, Standard General Master Fund L.P. ("Standard General"), and its designee on the White Energy board, Vladimira Mircheva ("Mircheva"), brought derivative litigation against Continenza and other White Energy board members (the "*White Energy Action*") alleging that Continenza and others took improper actions to block a sale of White Energy.[2] A-28-29. Standard General's verified complaint in the *White*

---

[1] The companies are Datasite LLC, Portola Packaging, Inc., Southwest Georgia Ethanol, Aventine Renewable Energy, Inc., White Energy, Inc., Neff Corporation, Kodak, Sorenson Communications LLC, and Vivial Holdings LLC. A-675-677, A-682-687.

[2] *Standard General Master Fund L.P., et al., v. White Energy Holdco, LLC, et al.*, No. 2017-0561-JRS (Del. Ch. 2017).

*Energy Action* (the "*White Energy Complaint*") alleged that Akin Gump represented Continenza personally during this board skirmish. A-40-41, A-47.

According to the *White Energy Complaint*, in July 2016, White Energy brought Continenza on as chairman of its board of directors and the White Energy board ratified documents purporting to set forth Continenza's anticipated compensation in connection with that role. A-46-47. But Continenza did not execute the original agreements ratified by the White Energy board, and instead continued negotiating his compensation—with Akin Gump's assistance and without the board's knowledge. A-47. As recounted in Paragraph 55 of the *White Energy Complaint*:

> [I]t was only in February 2017 that Ms. Mircheva was notified that Mr. Continenza never executed the original agreements ratified by the Board, and that for several months he had been negotiating revised terms of his engagement and the Options Agreement exclusively with Mr. Majeske and SVP, without the Board's knowledge. ***Akin Gump … represented Mr. Continenza in these discussions and sent a package with a revised set of documents drafted by Akin Gump in February 2017***.

A-47 (emphasis added).

Continenza (and the other defendants) answered the *White Energy Complaint* on November 17, 2017 ("*White Energy Answer*"). A-97-98. In their answer to Paragraph 55 of the *White Energy Complaint*, Continenza and the other defendants stated:

9

> **ANSWER**: Defendants deny the allegations set forth in paragraph 55 of the Amended Complaint, except ***admit that Akin Gump represented Mr. Continenza and sent documents to the Board in February 2017***.

A-121.[3]

Thus, the *White Energy Complaint* and *White Energy Answer* make clear that Continenza used Akin Gump as his ***personal counsel*** in negotiations regarding his compensation in 2016 and 2017. Continenza also then worked with Akin Gump in its capacity as counsel to White Energy in connection with the company's potential sale in early 2017.

Five years after Continenza answered the *White Energy Complaint*, in the instant litigation before the District Court, Defendants sought to rebut his clear and unambiguous admission that "Akin Gump represented Mr. Continenza" by submitting declarations from Matthew B. Stein ("Stein") of Kasowitz Benson Torres LLP (the "Stein Declaration") (A-23), who represented White Energy and Mr. Continenza in the *White Energy Action, see* A-24; Continenza (the "Continenza

---

[3] The District Court discounted the import of the *White Energy Answer* because it was not verified. SPA-30. First, verified or not, Plaintiffs' allegation that Continenza admitted Akin Gump represented him in his dealings with the White Energy board was still well-pled. Second, the *White Energy Complaint*, which contained the allegation that Akin Gump "represented Mr. Continenza" and that Continenza sent the White Energy board "a revised set of documents drafted by Akin Gump," *was* verified. *See* A-47. Whether they came from verified pleadings or not, Plaintiffs' well-pled allegations created a genuine issue of material fact as to whether in 2017, Akin Gump was Continenza's personal counsel.

Declaration") (A-205); and Daniel Fisher ("Fisher") of Akin Gump (the "Fisher Declaration") (A-207). These carefully crafted declarations (the "2022 Declarations") collectively seek to rebut the verified allegations in the *White Energy Complaint* and Continenza's admission of the truth of those allegations in the *White Energy Answer*. At best, however, the 2022 Declarations simply create a factual dispute as to whether Akin Gump actually represented Mr. Continenza personally in his compensation negotiations with the White Energy board. As described in Section II.A.2, *infra*, the District Court improperly resolved that factual dispute in Defendants' favor.

First, the Stein Declaration states:

> The admission in paragraph 55 of the Answer that "Akin Gump represented Mr. Continenza" is inconsistent with paragraphs 39 and 40 of the Answer, our subsequent interrogatory responses, and my recollection of the facts. To the best of my knowledge, no attorney from Akin Gump personally represented Mr. Continenza in connection with the events relevant to the White Energy Matter or the litigation itself. I do not recall the circumstances under which this statement in paragraph 55 of the Answer was made.

A-25. The Stein Declaration certainly does not definitively rebut Plaintiffs' well-pled allegations that Standard General and Ms. Mircheva stated in a verified pleading, admitted by Continenza, that Akin Gump represented Continenza personally. As described below, the Stein Declaration at best creates a genuine issue of material fact on the question.

11

*First*, the denials by the defendants in the *White Energy Action* of the allegations in Paragraphs 39 and 40 of the *White Energy Complaint* are not inconsistent with Continenza's admission in Paragraph 55 "that Akin Gump represented Mr. Continenza and sent documents to the Board in February 2017." A-25. Paragraphs 39 and 40 of the *White Energy Complaint* alleged that, in January 2017, "Continenza . . . invited his ***personal lawyer from the Akin Gump law firm*** to participate in [a White Energy] board call" to discuss inbound interest from a potential buyer of White Energy and "engaged Akin Gump to prepare a response to the inquiry." A-40-41. In the *White Energy Answer*, Continenza and the other defendants denied the allegations of paragraphs 39 and 40, except to "affirmatively state that the Corporation engaged Akin Gump." A-114-115.

This denial is not inconsistent with the *White Energy Answer*'s admission that, as to paragraph 55 of the *White Energy Complaint*, "Akin Gump represented Mr. Continenza and sent documents to the Board in February 2017." A-121. Paragraphs 39 and 40 addressed only Continenza's actions as a White Energy board member related to the potential sale of White Energy and did not directly address his relationship with Akin Gump outside of the context of that potential transaction. *See* A-40-41.

***Second***, Mr. Stein's statement that "To the best of my knowledge, no attorney from Akin Gump personally represented Mr. Continenza in connection with the

12

events relevant to the White Energy Matter or the litigation" carefully avoids saying whether Akin Gump personally represented Continenza in connection with his compensation package from White Energy. A-25. The Stein Declaration defines the "White Energy Matter" to be the *litigation* between Standard General and defendants.[4] It does not define what "events relevant to the White Energy Matter" means. Was Mr. Continenza's having Akin Gump negotiate his compensation as Chairman of the White Energy board an "event[] relevant to the White Energy Matter"? Mr. Stein's statement, written with full knowledge of Plaintiffs' allegations, appears to be very carefully drafted to appear to refute those allegations without necessarily doing so. Mr. Stein could have flatly stated that Akin Gump did not represent Continenza in connection with negotiating his compensation as chairman of the White Energy board. He did not do so. Mr. Stein also could have refuted the specific allegation that Akin Gump sent certain papers to the White Energy board on Continenza's behalf. Again, he did not do so.

   *__Third__*, as to Continenza's critical admission that "Akin Gump represented Mr.

---

[4] *See* A-23 ("In August 2017, an action captioned *Standard General Master Fund L.P., et al., v. White Energy Holdco, LLC, et a1*., No. 2017-0561-JRS (Del. Ch. 2017) (the "White Energy Matter") was filed in the Delaware Court of Chancery against White Energy Holdco, LLC..."). Thus, Mr. Stein's statements regarding Akin Gump and Continenza about the "White Energy Matter," by the terms of his declaration, do not encompass Continenza's personal negotiation with White Energy over his compensation as the Chairman of White Energy.

Continenza and sent documents to the Board in February 2017," all Mr. Stein could say was: "I do not recall the circumstances under which this statement in paragraph 55 of the Answer was made." A-25. To be clear, Mr. Stein was one of just two attorneys from the Kasowitz firm whose names appear in the signature block on the *White Energy Answer*. A-203. Mr. Stein's inability to explain the "circumstances" under which Continenza (through his law firm) made the contemporaneous admission that "Akin Gump represented Mr. Continenza" in connection with his compensation negotiations speaks volumes. Mr. Stein's admitted lack of knowledge, in combination with Mr. Stein's failure to directly address Plaintiffs' allegations regarding Akin Gump's representation of Continenza between July 2016 and February 2017, calls into doubt the usefulness of the entirety of the Stein Declaration. If it is true that Mr. Stein cannot recall why he made those statements, then his effort to deny—five years after the fact and without any specificity—the existence of a relationship between Akin Gump and Continenza should be accorded little, if any, weight.

Continenza does no better in his Declaration. Continenza first declares that Akin Gump was not his "long-time personal counsel." A-205-206. Whether Akin Gump's personal representation of Continenza was "long-term," or just for the negotiations with White Energy regarding his chairmanship, is not relevant. Second, like the Stein Declaration, the Continenza Declaration carefully, but vaguely, states

14

that he "did not retain Akin Gump to personally represent me in connection with the events relevant to the White Energy Matter or the litigation itself . . . ." A-206. Again, the Continenza Declaration defines the "White Energy Matter" to be the *litigation* between Standard General and defendants in the White Energy Action,[5] and it does not define what "events relevant to the White Energy Matter" means. Continenza could have clearly stated that Akin Gump never represented him personally. He could have clearly stated that Akin Gump did not represent him in his compensation negotiations with the White Energy board. He did neither. Continenza's carefully lawyered 2022 Declaration at best creates a genuine issue of material fact as to whether Akin Gump ever served as his personal counsel.

Continenza left the more general denial to Akin Gump. Unlike Mr. Continenza's Declaration, Mr. Fisher's 2022 Declaration *does* directly state that "Akin Gump has never represented Mr. Continenza in his individual or personal capacity." A-208. But Fisher's *basis* for this straightforward declarative statement is oddly unclear: Fisher says his Declaration is "based on *either* my personal

_____

[5] As with the Stein Declaration, Continenza's Declaration defined the term "White Energy Matter" as being limited to the litigation brought by Standard General: "the Consolidated Complaint contains certain allegations regarding my relationship with Akin Gump in connection with litigation involving White Energy, Inc. and White Energy Holdco, LLC (together, "White Energy"), filed in the Delaware Court of Chancery, styled Standard Gen. Master Fund L.P., et al., v. Majeske, et al., No. 2017-0561 (Del. Ch. Oct. 16, 2017) (the "White Energy Matter"). A-205-206.

15

knowledge *or* my review of Akin Gump's books and records." A-207. The use of the disjunctive ("either/or") rather than the conjunctive ("and") obscures whether it was Fisher's "personal knowledge" or his review of "books and records" that led him to conclude that Akin Gump did not represent Continenza in his negotiations with the White Energy board. The Fisher Declaration certainly does ***not*** say that Fisher had any first-hand knowledge of whether Akin Gump represented Continenza in those negotiations. And the Fisher Declaration does not explain what, if anything, Akin Gump's "books and records" said about the role the firm may have played in helping Mr. Continenza negotiate his compensation package at White Energy. The Fisher Declaration's oddly-worded general denial cannot definitively refute the contemporaneous admissions by Continenza or the verified allegations of the White Energy Plaintiffs.

Facing a dispute of fact as to whether Akin Gump had served as Continenza's personal counsel in his negotiations with White Energy, the District Court erred by crediting Defendants' evidence (the 2022 Declarations) over Plaintiffs' evidence (a contemporaneous verified complaint and Continenza's admission of its truth). This dispute should not have been resolved in a proceeding governed by Rule 56.

### 3. Continenza Introduces Akin Gump To Kodak

Prior to late 2018, there is no evidence that Kodak had ever retained Akin

Gump as counsel.[6]  In late 2018, Akin Gump was retained in connection with the sale of Kodak's Flexographic Packaging Division.  A-683; A-239-240.  At the time, Continenza was Chairman of Kodak's Board and a member of the committee of the Board charged with selecting a law firm for that transaction.  A-240.  Neither Kodak nor Continenza deny that Akin Gump may have been initially proposed by Continenza.  *See* A-239-240; A-683-684.  Continenza states that he "does not recall the circumstances as to how Akin Gump was first considered for the transaction."  A-683.

### C.  Kodak Explores A Transformative Business Shift And Seeks A Government Loan

In 2020, as the growing COVID-19 pandemic created drug shortages across the United States, Continenza and other Kodak executives recognized a unique opportunity for Kodak to transform its struggling business.  A-287.  Though well-known for its photography products, Kodak also had a history of manufacturing the chemical compounds, known as Key Starting Materials ("KSMs"), used to make "Active Pharmaceutical Ingredients" ("APIs").  A-286-287.  Kodak, however, had

---

[6] Continenza, in his response to Interrogatory 3, states he "believes that Akin Gump represented certain creditors in Kodak's bankruptcy proceedings in approximately 2013, although he was not involved in that retention and does not recall how or why the firm was selected."  A-682-683.  Continenza was correct.  Akin Gump was retained in 2013 to represent the Second Lien Noteholders Committee, not Kodak. *See In re Eastman Kodak Co.,* No. 12-10202, 2012 WL 2255719 (Bankr. S.D.N.Y. June 15, 2012).  Thus, there is no evidence that Akin Gump ever represented Kodak prior to 2018.

no history of manufacturing APIs, which requires regulatory approval. A-286-287; A-382.

Under Continenza's leadership, Kodak initiated a confidential effort—"Project Tiger"—to expand its production of KSMs and to begin manufacturing APIs. A-287. Kodak began by cold calling various government officials in hopes of securing a grant or loan to finance its project. A-287. The Biomedical Advanced Research and Development Authority ("BARDA") referred Kodak to Phlow Corp. ("Phlow"), a pharmaceutical management company that was negotiating a contract with BARDA to manufacture medicines to treat COVID-19 patients. A-287. Kodak and Phlow had an initial call on March 24, 2020, and in early April 2020, Phlow put Kodak in touch with the Director of the White House Office of Trade and Manufacturing Policy, Peter Navarro ("Navarro"), and a White House policy analyst, Chris Abbott ("Abbott"). A-288.

Throughout April and May 2020, Kodak worked with Navarro and Abbott on a proposal for a government loan to enable the Company to manufacture APIs, with the size of the potential loan growing from $27 million to $435-$575 million. A-288, A-290-291. In the meantime, on May 18, 2020, BARDA awarded Phlow an $812 million contract to manufacture "generic medicines and pharmaceutical ingredients that are needed to treat Covid-19." A-289.

### D. Kodak's Project Tiger Gains Steam

Throughout June 2020, Kodak continued working feverishly on Project Tiger. In the first week of June, Kodak began working with the U.S. International Development Finance Corporation (the "DFC") on Kodak's proposal for a government loan, and the DFC appointed Alale Allal ("Allal") as Kodak's primary point of contact. A-292. Continenza had "frequent one-on-one calls" with Allal regarding the Company's loan application. A-292. On June 8, 2020, Kodak secured a key customer: Phlow signed a letter of intent contemplating a "long-term supply contract through which Kodak would supply Phlow with certain APIs and KSMs." A-292.

On June 11, 2020, Kodak created a new "project clearance list for Project Tiger," described as a "highly confidential project." A-293. The list included Continenza and Roger Byrd ("Byrd"). A-293. On June 12, 2020, Continenza received a PowerPoint deck outlining a timeline for the loan application process: "(1) the application would be submitted on June 26, 2020; (2) the application would be finalized by the end of June 2020; (3) a letter of interest with the government would be signed in mid-July 2020; and (4) the loan would be awarded in mid-August 2020." A-293.

On June 15, 2020, Kodak signed another letter of intent with Phlow, "in furtherance of [Kodak's] application to the DFC to show it had a customer for its

future APIs." A-293. The next day, Continenza submitted a preliminary loan application to the DFC. A-295. Over the next few days, the Project Tiger team continued working on the loan application, updating financial models and other materials. A-296-297. An early model projected revenue of $211 million in 2025. A-296.

### E. Continenza Buys Kodak Shares and Awards Bonuses To The Project Tiger Team

On June 18, 2020, Kodak emailed all Project Tiger team members informing them they had "been added to the clearance list for a confidential project" and instructing them to preclear any stock trades with Byrd before trading. A-296. Five days later, on June 23, 2020, Continenza engaged in the June Trades, buying 46,737 shares of Kodak stock at $2.22 per share. A-297. Continenza made these trades on the last day of a "trading window" allowing insiders to trade Kodak shares (subject to Byrd's preclearance)—a window that had been open since May 15, 2020. A-297.

The SC Report falsely told investors and the public that Continenza only made the June Trades after he "received preclearance from Byrd in accordance with Company policy." A-330; A-412. "Company policy" required Continenza to get preclearance *in writing*. A-481. Akin Gump's false statement in the SC Report— that Continenza "received preclearance from Byrd in accordance with Company policy"—would never have been exposed had the NYAG not filed its Ex Parte Application. A-297-298, A-348; A-481.

20

Also on June 23, 2020, Continenza awarded Project Tiger team members $30,000 in bonuses.   A-298.

### F.    Kodak Submits Its Transformative DFC Loan Application

Three days after Continenza's June Trades, on June 26, 2020, Kodak submitted its final loan application to the DFC, seeking a $765 million loan (the "DFC Loan").   A-298.   Kodak projected that the loan would revolutionize its business.   It projected that Kodak's pharmaceuticals business would generate revenues of more than $200 million by 2024, and more than $300 million by 2025, with further increases over the following years.   A-298.   Kodak also projected that, after receiving the DFC Loan, the Company would generate a positive cash flow and EBITDA of more than $150 million by 2025—eclipsing Kodak's entire 2019 net income of $116 million and 2019 EBITDA of $95 million.   A-298.

### G.    The DFC Reviews Kodak's Loan Application And Works Jointly With Kodak On A Public Announcement

Throughout July 2020, the DFC conducted diligence on Kodak's application. A-299.   On July 22, 2020, Allal visited Kodak's headquarters in Rochester, New York, and informed Continenza and other Kodak management that the DFC wanted to enter into a letter of interest (the "DFC LOI") with Kodak regarding the DFC Loan.   A-299.   Allal informed Kodak that the DFC wanted to announce the DFC LOI on July 28, 2020, with a press release and public signing ceremony.   A-299. Kodak received the draft term sheet the next day, July 23, 2020.   A-299.

21

Kodak spent the next few days planning for the public announcement of the DFC LOI. Kodak contacted New York's Empire State Development and the office of New York's Governor, scheduled in-person press events between Continenza and government officials, drafted press materials stating that Kodak's new initiative "could change the course of history for Rochester and the American people," and planned an exclusive interview for Continenza with *The Wall Street Journal*, to be published the morning of July 28, 2020. A-299-300.

## H. Kodak's Board Awards Nearly 2 Million Stock Options One Day Before Announcing The DFC LOI

The day before the public announcement, Continenza and Byrd convened a joint meeting of Kodak's Board and Compensation, Nomination and Governance Committee (the "CNG Committee"). A-300. Byrd proposed that the CNG Committee grant nearly two million stock options to Continenza, Byrd, and other members of senior management. A-302-303. The majority of the options would be priced at $3.03 per share, just above Kodak's $2.62 per share stock price. A-301-303. Everyone knew that Kodak was set to announce the DFC LOI the very next day, and "most witnesses [interviewed] thought the stock price might go up" as a result. A-407. Nonetheless, the CNG Committee authorized the issuance of the Springloaded Options—1.75 million stock options to Continenza, and 45,000 stock options each to Byrd, David A. Bullwinkle ("Bullwinkle"), and Randy Vandagriff. A-302-303.

22

### I. Kodak Announces The LOI And Kodak's Stock Price Skyrockets

The day after the Board approved the Springloaded Options, on July 28, 2020, Kodak and the DFC announced the DFC LOI as planned, with a public signing ceremony. A-303. Kodak's stock price closed at $7.94 per share later that day. A-303.

The next morning, July 29, 2020, before the market opened, Continenza appeared on NBC and said Kodak could "bank on" receiving the DFC Loan. A-303-304. Continenza continued promoting Kodak's coming transformation later that day, appearing on Fox Business News and Yahoo! News. A-305. Kodak's stock price peaked at $60 per share that day, and closed at $33.20, *thirty dollars per share* above where the shares traded when the Board authorized the Springloaded Options. A-306.

### J. Kodak Discloses The Springloaded Options And Hires Akin Gump In The Face Of Public Scrutiny

Kodak was required to disclose on July 29, 2020 that Defendants had received millions of stock options right before the DFC LOI announcement. A-308. The media picked up on this disclosure, which quickly caused a flurry of regulatory and congressional scrutiny. A-308. Senator Elizabeth Warren raised concerns about the Springloaded Options in a letter to the Securities and Exchange Commission ("SEC"). A-312. Representative Maxine Waters and other members of Congress expressed "serious concerns" about securities transactions made by Kodak officers

and directors "at, or around, the time Kodak learned it could be eligible to receive a $765 million loan." A-313.

Amidst the growing maelstrom, on July 29, 2020, Continenza and Byrd "discussed the need to retain outside counsel to represent and advise [Kodak]" and "discussed potential law firms to retain, including Akin Gump." A-223-224. Continenza and Byrd thereafter "contacted Daniel Fisher at Akin Gump to proceed with the retention of Akin Gump." A-223-224. Thus, by the evening of July 29, 2020, Kodak, at Continenza's direction, had retained Akin Gump. A-223-224. Prior to this retention, the record reflects zero discussion at the Kodak Board that Akin Gump had previously served as Continenza's personal counsel, or that Continenza's behavior was at the center of the storm embroiling Kodak.

By July 31, 2020, Kodak's stock price had fallen to $21.85 per share. By August 3, 2020, it was down to $14.94 per share. A-312.

On August 7, 2020, the DFC announced that it would not proceed further with the DFC LOI until "recent allegations of wrongdoing" were "cleared." A-313.

These "allegations of wrongdoing," which lie at the center of this case, were never "cleared." Kodak never got the loan. Defendants' self-interested misconduct cost Kodak hundreds of millions of dollars in forecasted revenue.

### K. Kodak Forms The Special Committee, Which Hires Akin Gump

As noted above, Continenza caused Kodak to retain Akin Gump on July 29,

24

2020. On August 6, 2020, the Board formed the Special Committee to "oversee an internal investigation of the circumstances leading up to the DFC announcement," including to "analyze and assess any potential liability the Company may face as a result of the facts learned in the Internal Investigation." A-652, A-655. The Company's "potential liability" was, of course, largely related to the propriety of Continenza's June Trades and Springloaded Options.

After deciding to form the Special Committee, the full Board, with Continenza present, discussed whether the Special Committee should hire Akin Gump. A-652. The same Akin Gump attorney who Continenza had contacted on July 29, Daniel Fisher, was present at the Board meeting, and "confirmed that [Akin Gump] was not conflicted because it was not engaged prior to the activities in question." A-224; A-653. Fisher apparently did not disclose Akin Gump's longstanding relationship with Continenza, including personally representing Continenza in his negotiations with the White Energy board, plus having represented a total of *nine* companies where Continenza served as chairman of the board. *See* A-652-653. The Board minutes reflect that the Board left to the Special Committee the ability to "interview, select, and retain" legal counsel, though it expressed "no objection to the special committee engaging [Akin Gump]." A-653, A-655.

Later that evening, the Special Committee held its first meeting. A-658. Although the Special Committee had just been delegated the responsibility to choose

25

its own counsel, three Akin Gump attorneys, including Fisher, were somehow already present at the Committee's first meeting. A-658. After introductions, the minutes of that first SC meeting comprise less than one line of text. A-658. The Special Committee does not appear to have deliberated at all over whether or not to hire Akin Gump to investigate its former client Continenza. A-658.

### L. Stockholders Serve Litigation Demands And File Securities Class Actions

On August 13, 2020, Plaintiff Peters sent a shareholder demand (the "Peters Demand"), as required under N.J.S.A. § 14A:3-6.3, demanding that Kodak's Board take action to remedy the misconduct he identified in relation to the DFC Loan. A-277. That same day, a securities class action lawsuit was filed against Continenza, also in connection with the June Trades and Springloaded Options. *Tang v. Eastman Kodak Co., et al.*, Civil Action No. 3:20-cv-10462-FLW-ZNQ (D.N.J.) (the "*Tang* Action"). On August 24, 2020, Plaintiff Silverberg sent his shareholder demand (the "Silverberg Demand"), which requested similar relief to the Peters Demand. A-277.

### M. Akin Gump Enters Its Appearance On Behalf Of Continenza In The *Tang* Action

On September 11, 2020, while Akin Gump was still in the midst of its Special Committee investigation, the firm entered its appearance as counsel for "Defendants Eastman Kodak Company, James V. Continenza, and David Bullwinkle." A-257. Akin Gump attorneys subsequently negotiated on behalf of Continenza and the other

defendants to extend their time to respond to the complaint. A-211-212.

By this date, Akin Gump had therefore agreed to represent (1) ***Kodak***, to fend off a swarm of media and political investigations relating to Continenza's allegedly improper stock transactions; (2) ***the Special Committee***, to investigate potential claims against Continenza; and (3) ***Kodak and Continenza***, to defend against claims that Kodak and Continenza had engaged in securities fraud.

### N. Akin Gump Prepares And Delivers The SC Report

Within a month of receiving the first stockholder demand, Akin Gump had completed its investigation. On September 14, 2020, Akin Gump delivered its report and findings to the Special Committee, which the Special Committee adopted in full. A-659. The SC Report concluded that (i) Continenza did not possess material non-public information ("MNPI") when he engaged in the June Trades; and (ii) the Springloaded Options were proper because the Board properly relied on Byrd's advice, and the Defendants did not intend to take advantage of the Company's imminent stock price increase. A-315-316.

On November 6, 2020, the Special Committee, in a letter sent by Akin Gump, refused the Peters Demand, relying on the SC Report. A-319; A-464. On May 19, 2021, Peters filed a stockholder derivative complaint in New York state court (the "State Court Action") asserting that the Board wrongfully refused the Peters Demand. A-271.

### O.    The NYAG Exposes Undisclosed Facts

After receiving and reviewing confidential information from Kodak, on June 1, 2021, the NYAG filed its Ex Parte Application, stating that it had determined to file a complaint against Continenza for insider trading. A-474. The Ex Parte Application sought more documents from Kodak and public testimony from Continenza and Byrd. A-475. It cited facts unearthed from the NYAG's investigation that were omitted from the SC Report. Among other things, the NYAG's Ex Parte Application revealed (1) that Continenza did not "preclear" the June Trades in accordance with Company policy, and (2) a slew of additional MNPI available to Continenza when he made the June Trades. A-278. On August 23, 2021, Peters filed an amended complaint in the State Court Action incorporating these new facts exposed by the NYAG. On September 2, 2021, Silverberg filed a complaint in the Western District of New York (the "Silverberg Action"), also incorporating facts exposed by the NYAG. A-271.

### P.    Kodak Attempts A Do-Over

On September 17, 2021, the Board formed a *second* special committee (the "Second Committee") to investigate the claims brought by Peters and Silverberg, including the assertion that Akin Gump was conflicted. A-278. The Second Committee hired Crowell & Moring ("Crowell") as its legal counsel. A-280.

The Second Committee took just two weeks to conduct its "investigation." A-

490. The Second Committee interviewed no witnesses and reviewed no new documents. A-492-493. It essentially rubber-stamped Akin Gump's conclusions by reviewing a subset of the documents Akin Gump had prepared, A-492-493, adding only the conclusion that Akin Gump was not conflicted. A-535-536. The Second Committee's investigation into Akin Gump's independence, however, was limited to whether Akin Gump had previously represented *Kodak*. A-535-536, A-562. The Second Committee does not appear to have investigated whether Akin Gump ever represented Continenza personally:

> We do not credit any allegation that the Special Committee's chosen counsel—Akin Gump—was somehow conflicted or interested *because of their representation of the Company*. We did not see any conflict of interest, and, the Company's interests (and the directors' interest) are aligned in the various proceedings. We do not see any potential issue arising from Akin Gump's duties to the Company, particularly given its lack of prior representations of the Company.

A-562 (emphasis added). The Second Committee appears to have missed the point here. Akin Gump was conflicted in its representation of the Special Committee not just because of any prior relationship with *Kodak*, but because of its prior representation of *Continenza*, who was the chief target of the Special Committee's investigation. Kodak clearly knew that Akin Gump had represented Continenza in the *Tang* Action. And ten minutes on Westlaw would have revealed Akin Gump's representation of Continenza in relation to the facts underlying the *White Energy Action*.

29

**Q.  Relevant Procedural History**

Plaintiff Peters filed his stockholder derivative complaint in federal court on October 4, 2021 (the "Peters Action").  A-271.  The District Court consolidated the Silverberg Action and the Peters Action on January 18, 2022.  A-271.  Plaintiffs jointly filed their Complaint on February 16, 2022.  A-14.

Kodak filed its Motion on April 15, 2022.  A-16.  The District Court heard oral argument on August 9, 2023.  A-20.  On September 25, 2023, the District Court issued its Opinion granting summary judgment in Defendants' favor.  SPA-1.  On October 25, 2023, Plaintiffs filed their Notice of Appeal.  A-708.

This is Plaintiffs' Opening Brief on appeal.

## ARGUMENT

This Court reviews *de novo* a district court's grant of summary judgment, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.  *Halebian VI*, 548 Fed. Appx. at 642 (citing *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 47 (2d Cir. 2012)).

**I.  The District Court Applied The Wrong Legal Standard**

**A.  The District Court Properly Decided Defendants' Motion As A Motion For Summary Judgment**

The Complaint challenges Defendants' conclusion that the Company should not pursue claims against Continenza and others related to the June Trades and the Springloaded Options.  Since Kodak is a New Jersey corporation, New Jersey

substantive law governs whether those determinations were proper. Pursuant to the NJ Statute, as explained by the District Court, a corporation may obtain dismissal of a derivative suit:

> By making a "written filing with the court setting forth . . . facts to show: … that the independent director or directors made the determination [*i.e.,* to reject the shareholder's demand to commence litigation] ***in good faith after conducting a reasonable inquiry upon which the conclusions are based***."

SPA-17 (quoting N.J.S.A. 14A:3-6.5(5)(a)(i)-(ii)). Before the District Court, Plaintiffs acknowledged that the NJ Statute gave Plaintiffs the burden of proof in meeting the "good faith" and "reasonable inquiry" requirements. SPA-19.

The parties disagreed over whether the requirements of Rule 12(b)(6) or Rule 56 of the Federal Rules applied to Defendants' Motion. Plaintiffs, relying on this Court's decision in *Halebian v. Berv*, 644 F.3d 122, 129-33 (2d Cir. 2011) ("*Halebian IV*") (examining a Massachusetts statute substantively identical to the NJ Statute), argued that Rule 56 provided the appropriate procedural vehicle because of the need for fact finding incorporated into the New Jersey Statute. *See* SPA-19. Defendants sought to apply the requirements of Rule 12(b)(6). The District Court agreed with Plaintiffs. Citing *Halebian IV*, the Court wrote:

> [T]his Court is bound by the rulings of the Second Circuit with respect to the application of the Federal Rules of Civil Procedure. Accordingly, the Court will treat Kodak's motion as a motion for summary judgment under Federal Rule of Civil Procedure 56.

SPA-19. Plaintiffs do not challenge this decision.

### B. The District Court Erred By Applying The Wrong Standard In Evaluating Defendants' Summary Judgment Motion

While the District Court correctly determined that Defendants' Motion must be treated as a motion for summary judgment under Rule 56 rather than as a motion to dismiss under Rule 12(b)(6), it committed reversible error in failing to apply Rule 56 in accordance with binding precedent. In this Court's final decision in the *Halebian* litigation, 548 Fed. Appx. 641 (2d Cir. 2013), this Court instructed trial courts how to address the intersection between Rule 56 and the requirements of a statute substantively identical to the NJ Statute. This Court held that:

> In contrast to a typical summary judgment motion, a shareholder-plaintiff is not required to adduce evidence; ***he need only allege particularized facts that raise a genuine issue as to the Trustees' independence, good faith, or reasonable investigation.***

*Halebian VI*, 548 Fed. Appx. at 643 (emphasis added). It is well-established that "[a] 'genuine issue' exists—and summary judgment is therefore improper—where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Brandon v. Kinter,* 938 F.3d 21, 31 (2d Cir. 2019) (citations omitted).

The District Court erred in applying these principles. The District Court held that "while Rule 56 provides the procedural vehicle by which this motion has come before the Court, the Court is empowered to make findings with respect to whether the Board's decision not to pursue the claims set forth in this matter was made in good faith and after conducting a reasonable inquiry." SPA-20. Hence, rather than

evaluating the particularized facts Plaintiffs presented to determine whether they raised a genuine issue as to the good faith of the Special Committee, as Rule 56 and *Halebian VI* require, the District Court erroneously acted as the ultimate finder of fact on an undeveloped record.[7]  Among other errors, the District Court then drew inferences and resolved disputed issues of fact in favor of Defendants rather than Plaintiffs.  *See* SPA-25-38.

### C.   The District Court Erred In Failing To Resolve Ambiguities And Make Proper Inferences In Plaintiffs' Favor

The gravamen of Plaintiffs' argument below was that the Special Committee's investigation did not satisfy the NJ Statute because it did not conduct a good faith and reasonable inquiry into Kodak's potential claims against Continenza and the other Defendants.  The Special Committee hired conflicted counsel—Akin Gump—

---

[7] The District Court's statement that it "explored this issue at oral argument, and Plaintiffs took the position that the Court must, pursuant to the NJBCA, make its own factual findings," SPA-20, is neither accurate nor relevant.  At oral argument the Court inquired whether it could make a "factual determination" regarding Akin Gump's independence.  Plaintiffs agreed that the Court could do so, A-638-639, but Plaintiffs did not take the position that the Court could disregard the Rule 56 standard in doing so.  While Plaintiffs perhaps could have invoked the Rule 56 standard more explicitly, Plaintiffs' opposition papers clearly stated that "this Court thus must determine whether a genuine issue of material fact exists as to the committee's independence, good faith and procedural fairness."  Plaintiffs' Omnibus Opposition to Defendants' Motion to Dismiss, or in the Alternative, For Summary Judgment (ECF No. 135-19) at 37 (citations omitted).  In any event, regardless of Plaintiffs' remarks at oral argument, Rule 56 and this Court's opinion in *Halebian VI* establish the bounds of the District Court's decision-making ability, which the District Court erroneously exceeded.

to conduct its investigation; and Akin Gump then drew unreasonable and unsupported inferences that unreasonably favored Continenza in drafting the SC Report. Plaintiffs were not required to prove these allegations at the pleading stage; rather, they only needed to *allege particularized facts that raise a genuine issue as to the Trustees' independence, good faith, or reasonable investigation.* *Halebian VI*, 548 Fed. Appx. at 643. Here, Plaintiffs alleged particularized allegations as to both (i) Akin Gump's independence; and (ii) the good faith and reasonableness of Akin Gump's investigation, which allegations also suffice under the NJ Statute. The District Court erred by making factual findings in favor of Defendants and wholly failing to address whether the particularized facts alleged by Plaintiffs raised a "genuine issue," as required by *Halebian VI,* such that a reasonable fact finder could find in Plaintiffs' favor. SPA-25-38. *See also Halebian VI*, 548 Fed. Appx. at 643; *Brandon,* 938 F.3d at 31.

As further explained below, the District Court compounded its error by ignoring the basic requirements imposed on a lower court evaluating a motion for summary judgment. The law is entirely settled that, in determining whether there are genuine issues of material fact, the court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236; *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) ("[t]he evidence of the non-movant is

to be believed, and all justifiable inferences are to be drawn in his favor."); *In re PSE&G S'holder Litig.*, 801 A.2d 295, 312 (N.J. 2002) ("Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged…."); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007).

The District Court made no attempt to draw any inferences in Plaintiffs' favor and resolved all ambiguities in favor of Defendants. SPA-25-38. This failure by the District Court was improper and requires reversal of the District Court Order.

## II. Plaintiffs Raised A Genuine Issue As To The Good Faith And Reasonableness Of The Special Committee's Investigation

Plaintiffs' well-pled allegations raised a genuine issue as to whether Akin Gump's relationship with Continenza made Akin Gump incapable of conducting an independent investigation into Continenza's alleged misconduct. Plaintiffs also raised a genuine issue as to whether Akin Gump conducted a reasonable investigation into the June Trades and the Springloaded Options, or whether it instead drew unreasonable inferences in Continenza's favor.

### A. Plaintiffs Raised A Genuine Issue As To Akin Gump's Independence

Plaintiffs pled sufficient facts to create a genuine issue as to whether Akin Gump could conduct an independent investigation into potential misconduct by Continenza. Plaintiffs presented particularized facts showing that: (1) since 2013, of the thirteen corporate boards Continenza had chaired, ***nine*** of those boards

35

retained Akin Gump; (2) Akin Gump personally represented Continenza in 2016 and 2017 in connection with his appointment as board chairman at White Energy; (3) Continenza caused Kodak to hire Akin Gump in the midst of the growing scandal surrounding Continenza's June Trades and the Springloaded Options; and (4) while investigating Continenza as the Special Committee's counsel, Akin Gump entered its appearance on Continenza's behalf in the *Tang* Action, which accused Continenza of securities fraud as a result of the June Trades and Springloaded Options.

In considering Plaintiffs' allegations, the District Court did not seek to "resolve all ambiguities and draw all permissible factual inferences in favor of" Plaintiffs. *See Johnson*, 680 F.3d at 236. On the contrary, the District Court made inferences and resolved ambiguities in favor of Defendants. This is a clear error that requires reversal of the District Court's decision.

### 1. Continenza Had A Long-Term Relationship With Akin Gump

The particularized facts presented by Plaintiffs that Continenza was a major potential source of business and profit to Akin Gump are not in dispute. ***Nine times*** since 2013, Continenza chaired a board of directors that hired Akin Gump as company counsel. *See supra* pp. 7-8; A-676-677, A-682-687. Akin Gump had never been retained by Kodak until 2018, when Continenza sat on a Board committee that selected Akin Gump to act as Company counsel in connection with the sale of its

36

packaging division. *See supra* p. 17. Continenza has acknowledged having a professional relationship with Akin Gump partners Trey Muldrow and Daniel Fisher. A-692.

These facts could reasonably support an inference that Akin Gump would both have appreciated Continenza's ***past*** ability to send work its way, as well as Continenza's ***future*** potential as a lucrative source of business.[8] Thus, the District Court could reasonably have inferred that, as Special Committee counsel, Akin Gump would be highly motivated, when "investigating" Continenza's behavior, not to make any findings adverse to Continenza. *See, e.g.*, *Lewis v. Fuqua*, 502 A.2d 962, 965, 967 (Del. Ch. 1985) (finding that "past and present associations," including "political and financial dealings," between committee member and CEO committee was investigating raised "a question of fact as to" the member's independence"); *see also Johnson v. Hui*, 811 F. Supp. 479, 487 (N.D. Cal. 1991) (finding "no evidence that the SLC's counsel . . . are biased," in part because there was "no evidence" that the SLC's counsel "had any personal or business contacts with . . . the individual defendants, other than in its role as committee counsel").

The District Court, however, drew no such inferences in favor of Plaintiffs,

---

[8] Indeed, just months after Akin Gump delivered the SC Report clearing Continenza of any wrongdoing, another Continenza-chaired board retained Akin Gump to advise on a sale of the company. A-686-687.

37

merely finding that "the existence of a professional relationship does not create the kind of bias that would call into question an attorney's ability to comply with his or her ethical obligations, or otherwise taint the investigation, and Plaintiffs have not identified any cases holding that it does." SPA-31. The District Court's focus on "ethical obligations" to the exclusion of business motivations, and its even greater failure to evaluate whether an inference could be drawn that the "professional relationship" between Akin Gump and Continenza would render Akin Gump unwilling to alienate a potential source of business, constitutes a reversible error by the District Court.

### 2. Akin Gump Acted As Continenza's Personal Attorney

Plaintiffs presented particularized, verified factual allegations that Akin Gump personally represented Continenza from July 2016 through at least February 2017 in connection with his negotiations to serve as chairman of the board of White Energy. These well-pled allegations at the very least raise a genuine issue as to whether Akin Gump was legally capable of acting as independent counsel in investigating Continenza's alleged misconduct.

As explained above, in connection with the *White Energy Action*, Plaintiffs Standard General and Mircheva (Standard General's designee on the White Energy board) submitted the verified *White Energy Complaint*. Paragraph 55 of that complaint alleged, based upon Ms. Mircheva's knowledge as a member of the White

Energy board, that "Akin Gump … represented Mr. Continenza" in his compensation negotiations, and "sent a package with a revised set of documents drafted by Akin Gump in February 2017." *See supra* p. 9; A-47. In the *White Energy Answer*, filed in November 2017, just months after the events at issue, Continenza denied certain allegations in paragraph 55 of the *White Energy Complaint*, but specifically "***admit[ted] that Akin Gump represented Mr. Continenza and sent documents to the Board in February 2017.***" A-121. These contemporaneous verified allegations and their admission by Continenza are sufficient, in and of themselves, to create a genuine issue as to whether Akin Gump was Continenza's personal counsel in 2017.

Below, Defendants sought to counter these verified allegations, and Continenza's admission thereof, by submitting three 2022 Declarations (from Stein, Fisher and Continenza) created five years after the events at issue, that either failed to directly address the allegations regarding Akin Gump's representation of Continenza in 2016 and 2017 (Continenza and Stein), or were not based upon personal knowledge (Fisher). *See supra* pp. 10-16. Given the persuasiveness of the *White Energy Complaint* and *White Energy Answer* in establishing that Akin Gump represented Continenza, and the problems and ambiguities that exist with the 2022 Declarations, and in particular, their failure to directly address, much less refute, Plaintiffs' allegations, the District Court could have properly decided that the weight

of the evidence was entirely in Plaintiffs' favor. Instead, the District Court acknowledged that there were disputed facts, and chose to accept Defendants' facts over those presented by Plaintiffs: "the Court does not find the unsworn statement in the White Energy answer sufficient to support the conclusion that Akin Gump personally represented Continenza…." SPA-30.

This finding by the District Court constituted a fatal error requiring reversal for several reasons. **First**, whether or not the *White Energy Answer* was "unsworn," the allegations in the *White Energy Complaint* were verified. One of the plaintiffs in the *White Energy Action* herself sat on the White Energy board, and thus would have had personal knowledge of the negotiations between White Energy and Continenza. *See supra* p. 8. The District Court entirely failed to consider the sworn allegations of the *White Energy Complaint*. **Second**, even though the *White Energy Answer* was unsworn, Plaintiffs' allegations based on it were still well-pled, and themselves should have been sufficient to create a genuine issue of material fact. **Third**, the District Court failed to acknowledge the fact that the 2022 Declarations it chose to rely on were not contemporaneous, did not address the specific allegations (in two cases) or do not appear to have been based on personal knowledge (in one case). Finally, and most significantly, because the evidence submitted by Defendants was ambiguous in large part and amounted to nothing more than an attempt to contradict Plaintiffs' particularized facts, the court was required to resolve

40

those ambiguities in Plaintiffs' favor. *See Johnson*, 680 F.3d at 236. This would have required the District Court to find that there existed a genuine issue of material fact, precluding the District Court from granting Defendants' Motion. *See Halebian VI*, 548 Fed. Appx. at 643; *Brandon,* 938 F.3d at 31. The District Court's contrary factual finding in favor of Defendants, resolving all ambiguities in Defendants' favor, constitutes reversible error.

### 3. Continenza Caused Kodak To Retain Akin Gump On July 29, 2020 In Part To Protect His Personal Interests

On July 29, 2020, facing media scrutiny in the wake of the disclosure of the Springloaded Options, Continenza caused Kodak to hire Akin Gump. The District Court, applying the wrong legal standard, found "no disabling conflict in Akin Gump having represented Kodak" because Plaintiffs failed to provide evidence that "Akin Gump's job was to establish that no wrongdoing had occurred." SPA-27. But the District Court refused to grant Plaintiff reasonable inferences based on the particularized facts. Instead, the District Court granted ***Defendants*** the ***unreasonable*** inference that Akin Gump was retained solely "for purposes of responding to governmental inquiries." SPA-27-28.

As detailed above, the public disclosure of the Springloaded Options on the morning of July 29, 2020 triggered media scrutiny and soon invited governmental investigations. As the media reported on Continenza's windfall, A-308, Continenza and Byrd "discussed the need to retain outside counsel to represent and advise

41

[Kodak]" and "discussed law firms to retain, including Akin Gump." A-223-224. Continenza and Byrd thereafter "contacted Daniel Fisher at Akin Gump to proceed with the retention of Akin Gump." A-223-224. And thus, by the evening of July 29, 2020, without any discussion among the Board concerning any potential conflicts of interest, Kodak, at Continenza's direction, had retained Akin Gump. A-223-224.

Akin Gump explained away its July 29, 2020 retention in the SC Report by stating that, "[f]ollowing the DFC Announcement," it was hired "in connection with" "requests for documents and information from regulators and governmental entities." A-377. The SC Report specifically cited requests for documents from the House Select Subcommittee on the Coronavirus Crisis, the House Financial Services Committee, the House Committee on Oversight and Reform, the NYSE, and the Financial Industry Regulatory Authority ("FINRA"). A-377.

The record does not support the District Court's conclusion that Akin Gump was only hired on July 29, 2020 "for purposes of responding to governmental inquiries." Kodak did not even *disclose* the Springloaded Options until July 29, 2020. A-308. The Congressional committees' joint document request was not sent until August 4, 2020. A-258. The record does not reflect when the NYSE and FINRA made their respective document requests, but it is reasonable to infer that they were not made until after July 29, 2020. Consequently, it was *not* reasonable

42

to infer, as the District Court here did, that Kodak retained Akin Gump solely "for purposes of responding to governmental inquiries" that had not yet even been made. SPA-27-28.

It is more reasonable to infer that Akin Gump was retained to *defend* Kodak and Continenza from mounting allegations of impropriety. Viewed in this light, it is altogether unsurprising that Akin Gump was also initially hired to defend Continenza alongside Kodak in the *Tang* Action.

The facts pled raise a genuine issue as to whether Akin Gump was appropriately chosen as independent counsel to *investigate* Continenza at the same time it had been hired to *defend* Continenza and Kodak. This is especially true since the allegations Akin Gump was hired to "investigate" were the exact same allegations that the government, the media, and the *Tang* Action had made *against* Continenza and Kodak.

As the New Jersey Supreme Court recognized in *In re PSE&G*, the goals of *defending* and *investigating* are fundamentally at odds. 801 A.2d at 316 (special committee counsel "needlessly risked creating a conflict by briefly assuming a dual role as the Board's investigator and litigation counsel"). And as noted below, the facts here go well beyond *PSE&G*. The Special Committee could not reasonably rely on Akin Gump to *investigate* Continenza, when just eight days earlier Akin Gump had been hired to *defend* Continenza and Kodak. The District Court's

43

findings, which favored Defendants and made inferences in their favor, constitute reversible error.

### 4. The Totality Of The Allegations Raise A Genuine Issue As To Akin Gump's Independence

Questions of independence should not be decided "in isolation from each other"; rather, the court should consider and "draw all reasonable inferences from the totality of those facts in favor of the plaintiffs." *Delaware Cty. Emps' Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015) (finding that the "facts . . . when taken together, support an inference that the director could not act independently of the interested party").[9] Though the District Court wrote that it had "considered [Akin Gump's] alleged conflicts both individually and collectively," SPA-27, the Opinion reads more like a box-checking exercise. Thus, the District Court dismissed Plaintiffs' allegations that Akin Gump was conflicted because it failed to find a single conflict that by itself would be "disabling." *See* SPA-26-38.

For example, in regard to Akin Gump's "ministerial" representation of Continenza in the *Tang* Action, the District Court found that "'briefly assuming a dual role as . . . investigator and litigation counsel' does not *by itself* create a disabling conflict." SPA-32 (quoting *In re PSE&G*) (emphasis added). But the

---

[9] S*ee also Lewis*, 502 A.2d at 967 ("These potential conflicts of interest or divided loyalties, when considered as a whole, raise a question of fact as to whether [a special litigation committee member] could act independently.") (emphasis added).

District Court's reliance on *PSE&G* here ignored a crucial distinguishing factor: in *PSE&G*, the brief dual representation, though "clearly [] inappropriate," and a "needless[] risk" was the *only* conflict alleged against the investigating firm. *In re PSE&G*, 801 A.2d at 316; *id.* at 322 (Stein, J., concurring). Here, Akin Gump's appearance in *Tang* is just one of *many* facts demonstrating Akin Gump's long relationship with, and allegiance to Continenza. One doubts that the *PSE&G* court would have found it appropriate, for example, if the investigating counsel had previously personally represented a target of the investigation, as Akin Gump did here.

Thus, though the District Court properly recognized that Akin Gump's appearance in *Tang* was not "a particularly wise course of action," the District Court failed to consider this representation alongside Akin Gump's other, multiple disabling conflicts. Considering the facts together, Akin Gump's appearance in *Tang* was not simply a temporary lapse in judgment that "needlessly risked creating a conflict," *In re PSE&G,* 801 A.2d at 316, but rather just another step along a long road Continenza and Akin Gump had traveled, and likely hoped to continue traveling, together.

## B. Plaintiffs Raised A Genuine Issue As To The Reasonableness Of Akin Gump's Investigation

Plaintiffs' well-pled allegations also raise a genuine issue as to whether Akin Gump conducted a reasonable investigation into Continenza's alleged misconduct.

45

Plaintiffs allege that Akin Gump's conflict manifested in Akin Gump ignoring important evidence and drawing unreasonable inferences from other facts. In analyzing these allegations, the District Court held:

> The relevant question is whether the Special Committee's inquiry was "so restricted in scope, so shallow in execution, or otherwise so *pro forma* or half hearted as to constitute a pretext or sham." This standard is not even close to being met here.

SPA-34 (citing *In re PSE & G*, 173 N.J. at 292). In finding that this "standard is not even close to being met," the District Court failed to apply the *Halebian VI* standard. Again, Plaintiffs were not required to "meet [a] standard" of proof. Plaintiffs needed only to ***"allege particularized facts"*** that ***"raise a genuine issue"*** as to whether the Special Committee conducted a ***"reasonable investigation."*** *Halebian VI*, 548 Fed. Appx. at 643 (emphasis added).

Plaintiffs raised a material issue as to the reasonableness of Akin Gump's investigation in two key respects. First, Akin Gump falsely concluded that Continenza had complied with Kodak's insider trading policies when making the June Trades. Second, Akin Gump ignored important, undisclosed evidence that the June Trades were based on MNPI.

### 1. Akin Gump Falsely Concluded That Continenza Had "Pre-Cleared" His June Trades In Compliance With Company Policy

Akin Gump reported in the SC Report, without qualification, that "Continenza received preclearance from Byrd [for the June Trades] in accordance with Company

46

policy." A-412, A-437. Defendants now admit, however, that this statement was false. A-706-707. The SC Report called this factual finding "particularly significant." A-437. Akin Gump specifically highlighted that Continenza "complied with Kodak policies" and "precleared his trades with Byrd as Kodak's general counsel" when rejecting Plaintiff Peters' Demand. A-467-468.

No one would ever have known that this statement was false, had the NYAG not publicly filed its Ex Parte Application. This filing, however, exposed that Continenza had ***not*** complied with Kodak's insider trading policies. Kodak's insider trading policies required Continenza to "pre-clear any transaction in Kodak Securities" by "submitting a request 'via email' to [General Counsel] Byrd at least one day in advance of the proposed transaction," and then to wait until he "receive[d] a response whether or not the transaction is permissible." A-297; A-706-707. The NYAG alleged that it found no such documentation. A-481. Rather, the NYAG alleged that Continenza and Byrd:

> [H]ave stated that Continenza sought and received pre-clearance to purchase Kodak stock from Kodak's General Counsel ***during a telephone call*** either on June 23, 2020 or during the preceding days. However, neither Continenza nor Kodak's General Counsel has any recollection of the details of any discussion.

A-481; A-706-707. This admission from Continenza and Byrd demonstrated that a "particularly significant" fact in the SC Report was actually false.

Falsely telling investors, government investigators, and the world that

47

Kodak's insider trading policies were followed when they were not makes Akin Gump's investigation into the June Trades unreasonable. At the very least, Plaintiffs raised a genuine issue as to whether this false conclusion by Akin Gump rendered the Special Committee investigation into the June Trades unreasonable. The District Court erred by failing to give Plaintiffs the reasonable inferences to which Plaintiffs were entitled.

### 2. Akin Gump Ignored Facts In Concluding That Continenza Did Not Have MNPI When He Made The June Trades

Second, Akin Gump omitted and/or misrepresented several key facts regarding the MNPI Continenza possessed when he made the June Trades. Akin Gump concluded that Continenza did not possess MNPI because the DFC Loan application was at a "highly uncertain" stage and was "widely viewed" as having a "low probability of success" at the time of the June Trades. A-414, A-422. That conclusion was already dubious in light of the public record *prior* to the NYAG filing its Ex Parte Application. The NYAG, however, exposed a trove of unreported facts, including that:

- On June 9, 2020, Kodak's Chief Technical Officer, Terry Taber, emailed a colleague, writing that the DFC Loan application was "going well";

- Bullwinkle told a colleague on June 15, 2020 that he was "optimistic yes!" about the application;

- Asked whether his calls with the White House were "good," on June 17, 2020 Continenza responded, "Very";

- Continenza told Phlow—its first committed customer for APIs—on June 18, 2020, that "Kodak will execute everything we commit to" and he "[l]ook[ed] forward to building an alliance together for all of America;

- Kodak paid $350,000 to consultant Everglade to work towards securing the loan; and

- Continenza spent at least a third of his time between May and July 2020 working on Project Tiger.

A-477, A-478-480; A-567.

These facts, when added to the facts already in the public record, make clear the large volume of MNPI that Continenza possessed when he made the June Trades. They also shine a light on Akin Gump's unexplained decision not to include these facts in the SC Report. Contrary to the District Court's conclusion, this observation is not Plaintiffs' quibbling about how Akin Gump "weighed" conflicting evidence in the SC Report. *Contra* SPA-36. The SC Report did not "weigh" these facts; it buried them.

Plaintiffs' allegations about material, omitted facts from the SC Report, only brought to light by the NYAG, are sufficiently *"particularized"* to *"raise a genuine issue"* as to whether the Special Committee conducted a *"reasonable investigation."* *Halebian VI*, 548 Fed. Appx. at 643.

## III. The Second Committee's Report Does Not Cleanse Akin Gump's Conflicts

After the NYAG Action revealed further issues with the SC Report, Kodak attempted a "do-over" by forming the Second Committee. As Plaintiffs noted in

49

their briefing below, the NJ Statute does not contemplate corporate boards forming *seriatim* special committees each time a stockholder plaintiff points out flaws in the first committee's conclusions.[10]  The District Court, having erroneously concluded that the Special Committee's investigation satisfied the NJ Statute, did not reach the question of whether the Second Committee conducted a good faith, reasonable investigation.  The District Court did, however, find that the Second Committee's determination that Akin Gump was independent "is further evidence that it was neither unreasonable nor in bad faith for the Special Committee to entrust the investigation to Akin Gump."  This conclusion constitutes reversible error and the Second Committee's investigation should be afforded no weight by this Court.

 ***First***, the Second Committee did not meaningfully investigate whether Akin

---

[10] A special litigation committee is "a unique creature," *Beam v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004), as it is the "only instance in American Jurisprudence where a defendant can free itself from a suit by merely appointing a committee to review the allegations of the complaint is in the context of a stockholder derivative suit." *Lewis*, 502 A.2d at 967.  Defendants have not cited any case in which a second special committee was allowed to re-investigate the same facts investigated by a first special committee, because to Plaintiffs' knowledge, it has never happened before. Each of the cases Kodak cited below involved meaningfully different situations, none of which involved the formation of a second special litigation committee to review, without any new investigation, the findings of a prior committee.  *See, e.g., In re PSE&G*, 801 A.2d at 303-304 (involving the same special committee delivering a supplemental report after two new complaints caused the committee to expand the scope of its review); *George Leon Family Tr. v. Coleman*, No. 12-cv-4401 (JAP), 2014 WL 2889741 (D.N.J. June 25, 2014) (new demand letter, seeking broader relief after settlement of prior derivative litigation, was subject of new investigation).

Gump was conflicted while representing the Special Committee. The Second Committee apparently failed to uncover and consider (1) the *White Energy Complaint* and the *White Energy Answer*, (2) Akin Gump's prior retentions at companies where Continenza was a director or officer, and (3) Continenza's professional relationships with Akin Gump attorneys. Crowell also inexplicably concluded that Akin Gump had not previously represented the Company, apparently ignoring its representation of Kodak in the sale of the Company's packaging division and its retention by Kodak on July 29, 2020. Thus, the Second Committee's determination that Akin Gump was not conflicted was not based on a reasonable, good faith inquiry.

**<u>Second</u>**, the Second Committee's affirmation of the SC Report was not based on its own investigation. Crowell, the Second Committee's counsel, "did not conduct any new witness interviews" or gather any new evidence. A-492. Instead, the Second Committee reviewed the "factual record prepared by Akin Gump" (but "did not review every document collected by Akin Gump") and "additional testimony provided by Continenza and Byrd to the SEC." A-492-493. This cursory review of a prior investigation already tainted by Akin Gump's conflicts was "so restricted in scope, so shallow in execution, or otherwise so *pro forma* or half hearted as to constitute a pretext or sham." *In re PSE&G*, 801 A.2d at 315-316; *see also London v. Tyrrell*, No. 3321-CC, 2010 WL 877528, at *17 (Del. Ch. Mar. 11, 2010)

(a proper investigation "explore[s] all relevant facts and sources of information that bear on the central allegations in the complaint" and must not "simply accept[] defendants' version of disputed facts without consulting independent sources to verify defendants' assertions").

## CONCLUSION

The District Court committed reversible error by misapplying the Rule 56 standard in considering Defendants' Motion. Plaintiffs presented well-pled allegations that raised at least two genuine issues of material fact. First, Plaintiffs pled that Akin Gump lacked independence from Continenza such that it was not appropriately chosen to investigate Continenza. Second, Plaintiffs pled that Akin Gump ignored or misstated the facts in concluding that Continenza and the other Defendants did not breach any fiduciary duties. Rather than faithfully applying the law, the District Court made "factual findings" that resolved ambiguities in the evidence in Defendants' favor.

The District Court should be reversed, and this Action should be remanded for further proceedings.

Dated: March 21, 2024

Respectfully submitted,

**KESSLER TOPAZ
 MELTZER & CHECK, LLP**

By: */s/ Lee D. Rudy*

Lee D. Rudy (NY # 2817534)
Eric L. Zagar (NY # 4555512)

52

280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

**FARACI LANGE**
Hadley E. Lundback (NY # 437785)
1882 S. Winton Rd., Suite 1
Rochester, NY  14618
hadley@faraci.com
Tel: (585) 325-5150
Fax: (585) 325-3285

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 12,105 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Time New Roman.

Dated: March 21, 2024

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Decision and Order of the Honorable Elizabeth A.
    Wolford, dated September 25, 2023,
      Appealed From ....................................................... SPA-1

Judgment, filed on September 26, 2023,
      Appealed From ....................................................... SPA-40

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────────

In re EASTMAN KODAK COMPANY          **DECISION AND ORDER**
DERIVATIVE LITIGATION
                                      6:21-CV-6621 EAW

───────────────────────────────────

## INTRODUCTION

This shareholder derivative action arises out of the events surrounding a Letter of Interest ("LOI") entered into between nominal defendant Eastman Kodak Company ("Kodak") and the United States International Development Finance Corporation ("DFC") in July of 2020, discussing a contemplated loan of $765 million from DFC to Kodak to support the conversion of Kodak's manufacturing facilities to produce pharmaceutical products.[1] It consists of two matters commenced by Kodak shareholders and consolidated for all purposes into a single action denominated "In re Eastman Kodak Company Derivative Litigation." (Dkt. 71).

The operative pleading is the corrected verified consolidated stockholder derivative complaint. (Dkt. 129) (the "consolidated complaint"). In the consolidated complaint, plaintiffs Louis Peters ("Peters") and Herbert Silverberg ("Silverberg") (collectively "Plaintiffs") allege violations of the Securities Exchange Act of 1934 (the "Exchange

───────────────

[1] On September 27, 2022, this Court dismissed an action arising out of the same factual background and alleging violations of federal securities laws. *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 175 (W.D.N.Y. 2022), *appeal withdrawn sub nom.*, *Les Investissements Kiz Inc. v. Eastman Kodak Co.*, No. 22-2788, 2023 WL 3149527 (2d Cir. Jan. 26, 2023).

Act"), breaches of fiduciary duties, and unjust enrichment by Kodak's Executive Chairman and CEO James V. Continenza ("Continenza"), CFO David Bullwinkle ("Bullwinkle"), General Counsel Roger W. Byrd ("Byrd"), Senior Vice President Randy D. Vandagriff ("Vandagriff"), director Philippe D. Katz ("Katz"), director Richard Todd Bradley ("Bradley"), director Jason New ("New"), and director George Karfunkel ("Karfunkel") (collectively "Defendants").  (*Id*).  Continenza, Bullwinkle, Byrd, and Vandagriff are sometimes collectively referred to as "Option Recipients," while Katz, Bradley, and New are sometimes collectively referred to as the "CNG Committee."  Kodak is named as a nominal defendant.  (*Id*.).

Presently before the Court are: (1) a motion to dismiss for failure to state a claim, or in the alternative, for summary judgment filed by Kodak (Dkt. 100); (2) a motion to dismiss for failure to state a claim filed by Continenza, Bullwinkle, Byrd, Bradley, Katz, New, and Vandagriff (Dkt. 101); (3) a motion to dismiss for failure to state a claim filed by Continenza (Dkt. 102); and (4) a motion to dismiss for failure to state a claim filed by Karfunkel (Dkt. 103).  For the reasons that follow, the Court grants Kodak's motion for summary judgment and denies the remaining motions as moot.

## BACKGROUND

### I. Factual Background

Continenza became Kodak's Executive Chairman on or about February 20, 2019. (Dkt. 129 at ¶ 45).  Continenza and Kodak entered into an employment agreement and an "Award Agreement" pursuant to the Eastman Kodak Company 2013 Omnibus Incentive Plan (the "Incentive Plan").  (*Id*.).  These agreements provided Continenza with options to

purchase 1.75 million Kodak shares at various strike prices and were disclosed on April 1, 2019.  (*Id*.).

At that time, Kodak's market capitalization was approximately $100 million.  (*Id*. at ¶ 46).  Kodak's April 1, 2019 Form 10-K disclosed that its auditors had issued a going concern qualification based on its liquidity, capital resources, and negative cash flow.  (*Id*.). Each of Kodak's subsequent annual reports has included a similar going concern qualification.  (*Id*.).

On May 21, 2019, Kodak and Southeastern Asset Management ("Southeastern") entered into a Notes Purchase Agreement (the "Purchase Agreement") for $100 million of Secured Convertible Notes (the "Notes") due in 2021.  (*Id*.).  The Notes were convertible into Kodak stock at a price of $3.17482 per share.  (*Id*.).  Upon conversion, they would represent 42.8% of Kodak's outstanding shares.  (*Id*.).  At a February 2020 meeting of Kodak's board of directors (the "Board"), Karfunkel proposed that Continenza be given an additional two million options to offset the potential devaluing of his options associated with the Purchase Agreement between Kodak and Southeastern.  (*Id*. at ¶ 47).

Following the onset of the COVID-19 pandemic in 2020 and its associated drug shortages, Kodak recognized an opportunity to expand its pharmaceutical business, including the manufacture of key starting materials ("KSMs") that pharmaceutical companies use to make Active Pharmaceutical Ingredients ("APIs"), which are in turn used to make final drug products.  (*Id*. at ¶¶ 48-49).  Kodak began reaching out to governmental officials and agencies, looking for an opportunity to partner with the government to

SPA-4

leverage its chemical manufacturing capacity and expertise. (*Id*. at ¶ 49). Kodak gave this initiative the code name "Project Tiger." (*Id*.).

As part of Project Tiger, Kodak's Vice President of Public Affairs contacted the Biomedical Advanced Research and Development Authority ("BARDA"). (*Id*. at ¶ 50). BARDA was the federal agency responsible for investing in countermeasures to diagnose, treat, and protect against COVID-19. (*Id*.). BARDA suggested that Kodak reach out to Phlow Corporation ("Phlow"), a "pharmaceutical management company focused on securing domestic drug reserves." (*Id*.). Phlow was in the process of negotiating a contract with BARDA to manufacture medications to treat COVID-19. (*Id*.).

In March of 2020, Phlow's CEO Eric Edwards ("Edwards") told Kodak that he had been working with Congress, the White House, and other government agencies on increasing domestic pharmaceutical manufacturing. (*Id*. at ¶ 51). In April of 2020, Phlow connected Kodak with Peter Navarro ("Navarro"), the Director of the White House Office of Trade and Manufacturing Policy, and Chris Abbott ("Abbott"), a White House senior policy analyst. (*Id*. at ¶ 52). Kodak had several conversations with Navarro and Abbott in April and May of 2020. (*Id*.). On May 14, 2020, then-President Trump issued an executive order pursuant to the Defense Production Act allow DFC to issue loans to support "domestic production of strategic resources needed to respond to the COVID-19 outbreak." (*Id*. at ¶ 53).

On April 9, 2020, Kodak issued its annual proxy statement on Schedule 14A (the "2020 Proxy"). (*Id*. at ¶ 54). The 2020 Proxy solicited stockholder approval with respect to a May 20, 2020 annual meeting of shareholders. (*Id*.). The fourth proposal in the 2020

- 4 -

Proxy ("Proposal 4") sought to add approximately 2.2 million shares to the Incentive Plan, and was necessary because there were not enough shares available in the Executive Compensation Plan to satisfy the Board's February 2020 agreement to award additional options to Continenza. (*Id*. at ¶¶ 55-56). Kodak's shareholders approved Proposal 4 on May 20, 2020. (*Id*. at ¶¶ 57-58).

On May 18, 2020, BARDA awarded Phlow an $812 million contract to domestically manufacture generic medicines and pharmaceutical ingredients to fight COVID-19. (Dkt. ¶ 59). On May 22 and 28, 2020, Kodak employees discussed Kodak's ability to manufacture APIs with Navarro and Abbott. (*Id*. at ¶ 60). During the May 22nd call, in which Continenza participated, Kodak requested $27 million to allow it to swiftly bring itself into regulatory compliance to manufacture APIs. (*Id*. at ¶ 61). Navarro told Continenza that Kodak should "think bigger" and more "long term," and requested a more comprehensive proposal by May 28, 2020. (*Id*.).

On May 28, 2020, Kodak presented to Navarro and Abbott a proposal for a grant of approximately $435-575 million, to establish a new "U.S. Advanced API Manufacturing Center." (*Id*. at ¶ 63). Navarro set a deadline of June 3, 2020, for a more detailed proposal. (*Id*.).

On May 31, 2020, Abbott set up a call between Kodak and DFC for June 1, 2020. (*Id*. at ¶ 64). Continenza, Bullwinkle, and Byrd, among others, participated in the June 1, 2020 call. (*Id*.). During the call, personnel from DFC walked Kodak through DFC's loan application process and explained how a non-recourse financing loan might work. (*Id*.). Kodak had follow-up discussions with Abbott and DFC personnel in the first week of June

of 2020.  (*Id.* at ¶ 65).  During those discussions, Abbott directed Kodak to submit its updated proposal to DFC, rather than to Navarro.  (*Id.*).  Kodak's primary point of contact at DFC was Alale Allal ("Allal"), with whom Continenza had frequent one-on-one calls to ask or answer questions.  (*Id.*).  On June 8, 2020, Kodak and Phlow entered into a letter of intent contemplating a long-term supply contract whereby Kodak would supply Phlow with certain APIs and KSMs.  (*Id.* at ¶ 66).

On June 11, 2020, Kodak's Managing Director of Corporate Development Paula Gutkin directed that a new project clearance list be created for Project Tiger.  (*Id.* at ¶ 68).  Continenza and Byrd were both on the Project Tiger clearance list.  (*Id.*).  On June 12, 2020, Kodak's Chief Technical Officer ("CTO") Terry R. Taber ("Taber") sent Continenza and Bullwinkle a PowerPoint deck entitled "Project Tiger: Application for DFC-DPA Loan Program (DCF-014)" (the "Project Tiger Deck").  (*Id.* at ¶ 69).  The Project Tiger Deck set the following timeline for the loan application process: (1) application to be submitted by June 26, 2020; (2) application to be finalized by the end of June of 2020; (3) letter of interest with the government to be signed in mid-July 2020; (4) loan to be awarded in mid-August 2020.  (*Id.*).

On June 15, 2020, Kodak signed another letter of intent with Phlow.  (*Id.* at ¶ 70).  This letter of intent contemplated Phlow purchasing chemicals from Kodak and was entered into in furtherance of Kodak's application to DFC, to demonstrate that Kodak had a customer for future APIs.  (*Id.*).  On June 16, 2020, Kodak filed a preliminary loan application.  (*Id.* at ¶ 76).  Over the next few days, Kodak's management continued to supplement the DFC loan application with additional materials.  (*Id.* at ¶ 79).

On June 18, 2020, all Project Tiger team members were advised that they had been added to the clearance list for a confidential project.  (*Id*. at ¶ 80).  The email conveying this information included a link to an internal Kodak memo (the "Project Tiger Memo") advising Project Tiger team members that information associated with Project Tiger could constitute material non-public information ("MNPI").  (*Id*.).  The Project Tiger Memo warned against trading in Kodak stock with MNPI and instructed that team members preclear transactions with Byrd before trading.  (*Id*.).

On June 23, 2020, Continenza purchased 46,737 shares of Kodak stock at an average price of $2.22 per share (the "June 2020 Trades").  (*Id*. at ¶ 82).  June 23, 2020, was the last day of a "Window Period" that had been open since May 15, 2020, during which Kodak insiders were allowed to transact in Kodak stock.  (*Id*.).  Plaintiffs contend that Continenza did not comply with Kodak's insider trading policy in connection with the June 2020 Trades.  (*Id*. at ¶ 83).  In particular, Plaintiffs allege that Continenza did not comply with the requirement that he submit a request to Byrd via email at least one day in advance of the proposed transaction and wait to receive a response before transacting in Kodak stock.  (*Id*.).

Also on June 23, 2020, and at Continenza's direction, Kodak awarded Project Tiger team members $30,000 in bonuses.  (*Id*. at ¶ 84).  On June 26, 2020, Kodak submitted its final loan application to DFC.  (*Id*. at ¶ 85).  The final loan application contemplated a $765 million DFC loan and projected that Kodak's pharmaceuticals business would generate revenues of more than $200 million by 2024 and more than $300 million by 2025, with additional increases thereafter.  (*Id*. at ¶¶ 85-86).  Internally, Kodak projected that its

pharmaceuticals project would have positive cash flow and earnings before interest, taxes, depreciation and amortization ("EBITDA") of more than $150 million by 2025. (*Id.* at ¶ 86). In 2019, Kodak's entire net income was $116 million and its EBITDA was $95 million. (*Id.*).

DFC conducted due diligence on Kodak's final loan application through early and mid-July of 2020. (*Id.* at ¶ 88). On July 22, 2020, Continenza and Bullwinkle led Allal on a tour of Kodak's Rochester operations. (*Id.* at ¶ 89). Allal thereafter advised Continenza, Bullwinkle, and other members of Kodak's management that DFC wanted to enter into a letter of interest with Kodak regarding the requested loan. (*Id.*). DFC representatives further advised Kodak that DFC wanted to issue a press release announcing the letter of interest and hold a public signing ceremony on July 28, 2020. (*Id.*). On July 23, 2020, Kodak received the first draft of a term sheet setting forth the terms of the loan from DFC. (*Id.*).

On July 27, 2020, at 11:25 a.m., a Kodak employee erroneously sent press releases regarding the DFC LOI to several news outlets without including instructions that the release of the included information was embargoed until the next day. (*Id.* at ¶ 92). Prior to this error being corrected, the Twitter accounts for two Rochester-based news outlets tweeted that Kodak would be making a big announcement the following day. (*Id.* at ¶ 93). Kodak thereafter realized its mistake and contacted the parties to whom the press release had been sent, and the tweets were no longer available as of 12:56 p.m. (*Id.* at ¶ 94). On July 27, 2020, approximately 1.6 million shares of Kodak common stock traded, up from 74,983 shares traded during the previous trading session on July 24, 2020, and 80,840

shares traded on July 23, 2020. (*Id*. at ¶ 95). Kodak shares also increased in price by more than 23%. (*Id*.).

On July 27, 2020, Continenza and Byrd convened Kodak's Board and Compensation, Nominating and Governance ("CNG") Committee for a joint meeting. (*Id*. at ¶ 91). Katz, Bradley, and New were members of the CNG Committee. (*Id*. at ¶¶ 37-39). Byrd wanted the CNG Committee to grant options to members of Kodak's senior management, including himself, and had structured the option grants so that the lowest exercise price was $3.03 per share. (*Id*. at ¶ 91). The July 27, 2020 meeting was held telephonically, with Bullwinkle observing. (*Id*. at ¶ 97). The details of the DFC LOI and Kodak's business plan for pharmaceutical manufacturing were discussed. (*Id*.). Byrd then discussed the option grants with the CNG Committee members. (*Id*. at ¶ 98). Following Byrd's presentation, the CNG authorized the issuance of 1.75 million stock options to Continenza, with 28.75% of those options vesting immediately, and the remainder upon the conversion of the Southeastern Notes. (*Id*. at ¶ 99). The CNG Committee also awarded 45,000 stock option grants to each of Bullwinkle, Byrd, and Vandagriff. (*Id*. at ¶ 100).[2]

On July 28, 2020, Kodak and DFC announced the DFC LOI and held a public signing ceremony. (*Id*. at ¶ 101). That same day, *The Wall Street Journal* posted an article about the DFC LOI in which Continenza was quoted as saying that he expected the loan to

---

[2]     The parties vigorously contest whether these options were "springloaded." The consolidated complaint describes "springloading" as deliberately granting options in advance of publicly releasing positive news, and alleges that it is "both illegal as a matter of corporate law, and a violation of Kodak's compensation policies." (Dkt. 129 at ¶ 5).

create around 300 jobs in Rochester and 30 to 50 jobs in Minnesota. (*Id.*). Kodak's stock price closed on July 28, 2020, at $7.94 per share. (*Id.*).

On July 29, 2020, before the market opened, Continenza appeared on CNBC's *Squawk Box* to discuss the DFC LOI. (*Id.* at ¶ 102). Continenza stated while there was still "some work to do," he felt "very comfortable that we can bank on it" and "very comfortable we're gonna get to the end game." (*Id.*). Later that morning, Continenza appeared on *Fox Business News* and was interviewed by *Yahoo! News* regarding the DFC LOI. (*Id.* at ¶¶ 105-06). That same day, Kodak employees received an email from Continenza in which he announced the new strategic initiative and the creation of "Kodak Pharmaceuticals." (*Id.* at ¶ 107). "Kodak's stock price closed at $33.20 per share on July 29, 2020, after reaching a high of $60 per share and trading at an average price of $38.75." (*Id.* at ¶ 108).

Also on July 29, 2020, Continenza, Bullwinkle, Byrd, and Vandagriff each filed a Form 4 disclosing the option awards they had been granted on July 27, 2020. (*Id.* at ¶ 118). A few media outlets reported on the option grants after the markets closed. (*Id.* at ¶ 119). On July 30, 2020, Continenza filed a Form 4/A indicating that the options resulted from an earlier understanding with Kodak's Board. (*Id.* at ¶ 120).

Additional media scrutiny regarding the option award to Continenza caused Kodak's share price to drop. (*Id.* at ¶ 122). On July 31, 2020, Kodak's stock price fell to $21.85 per share. (*Id.* at ¶ 131). News reporting regarding the option awards continued over the weekend, and on Monday, August 3, 2020, Kodak's stock price closed at $14.94. (*Id.* at ¶ 132).

On August 3, 2020, U.S. Senator Elizabeth Warren submitted a letter to the Securities and Exchange Commission ("SEC") requesting that Kodak be investigated. (*Id*. at ¶ 133). On August 4, 2020, *The Wall Street Journal* reported that the SEC was expected to examine the July 27, 2020 stock option grants. (*Id*. at ¶ 134).

Also on August 4, 2020, Karfunkel and his wife filed a Schedule 13D with the SEC indicating that on July 29, 2020, they had donated 3 million Kodak shares to Congregation Chemdas Yisroel Inc. ("Chemdas Yisroel"), a charitable foundation that Karfunkel founded and controls. (*Id*. at ¶ 123). Plaintiffs allege that Chemdas Yisroel "appears to be a sham." (*Id*. at ¶ 125). On January 14, 2021, Karfunkel filed with the SEC a Schedule 13D stating that it was 1,937,708 shares, and not the originally reported 3 million shares, that were donated to Chemdas Yisroel. (*Id*. at ¶ 127).

On August 5, 2020, "several House Congressional committees sent a joint letter to Continenza requesting documents regarding the DFC Loan, as well as trading activity by Company executives before the loan was announced." (*Id*. at ¶ 135). These committees also sent a letter to DFC's CEO seeking documents. (*Id*.). In addition, members of Congress sent the SEC a letter raising concerns about the July 27, 2020 stock option grants. (*Id*. at ¶ 136).

After the market closed on Friday, August 7, 2020, DFC announced: "On July 28, we signed a Letter of Interest with Eastman Kodak. Recent allegations of wrongdoing raise serious concerns. We will not proceed any further unless these allegations are cleared." (*Id*. at ¶ 137). The following Monday, Kodak's stock price opened at $8.90, after closing at $14.88 per share on August 7, 2020. (*Id*.).

On August 6, 2020, the Board formed a special committee (the "Special Committee") "to investigate Continenza's June Trades, the July 2020 option awards, and Karfunkel's 'charitable donation' of Kodak stock." (*Id*. at ¶ 142). The Special Committee was comprised of New and Kodak director William Parrett ("Parrett"). (*Id*.). The Special Committee retained the law firm of Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") to assist in the investigation. (*Id*. at ¶¶ 10, 142). Akin Gump drafted a report dated September 15, 2020 (the "Special Committee Report"), which the Special Committee adopted in total. (*Id*. at ¶ 143). Plaintiffs contend that the Special Committee Report failed to disclose that Akin Gump "had acted as counsel for Continenza since at least February 2017" and "also failed to disclose whether it ever informed the members of the Special Committee of its work for Continenza." (*Id*.). The Special Committee Report found that Continenza did not have MNPI when he bought Kodak stock on June 23, 2020, that the July 27, 2020 option grants were proper, and that the alleged tax fraud scheme by Karfunkel was not provable. (*Id*. at ¶ 144).

As part of an investigation into Continenza's June 2020 Trades, the New York State Attorney General ("NYAG") served Kodak with a subpoena on November 26, 2020. (*Id*. at ¶ 19). On June 1, 2021, the NYAG filed an ex parte application stating that it had determined to file a complaint against Continenza for trading in Kodak securities based on MNPI. (*Id*.); *see* Ex Parte Application, *Letitia James v. Eastman Kodak Co., et al.*, Index No. 451652/2021 (N.Y. Sup. Ct. June 1, 2021).

On September 17, 2021, Kodak's Board appointed a second special committee (the "Second Committee") to perform an additional inquiry into the facts underlying this action.

(Dkt. 129 at ¶ 228).  The Second Committee had three members: New, Darren Richman, and Michael E. Sileck, Jr.  (*Id*. at ¶ 229).  The Second Committee retained the law firm Crowell & Moring ("Crowell"), which prepared a report (the "Second Committee Report"). (*Id*. at ¶ 236).  The Second Committee Report found that Akin Gump was not conflicted and otherwise reached the same conclusions as the Special Committee Report.  (*Id*. at ¶¶ 22, 25-27, 236).

## II.   Procedural Background

On August 12, 2020, Peters sent Kodak a shareholder litigation demand.  (Dkt. 111 at 1).  Silverberg sent Kodak a shareholder litigation demand on August 24, 2020.  (*Id*. at 1-2).  On September 14, 2020, the Board unanimously voted to accept the Special Committee Report.  (*Id*. at 9).

On May 19, 2021, Peters filed a putative shareholder derivative complaint in New York State Supreme Court, Monroe County (the "State Court Action").  (*Id*. at 12).  The State Court Action has been stayed pending resolution of the instant action.  (*Id*. at 13).

On September 2, 2021, Silverberg filed a putative shareholder derivative action in this Court, *Silverberg v. Continenza*, No. 6:21-cv-06567 (the "Silverberg Action").  On October 4, 2021, Peters filed a putative shareholder derivative action in this Court, *Peters v. Continenza*, No. 6:21-cv-06621 (the "Peters Action").  By Order dated January 18, 2022, the Silverberg Action and the Peters Action were consolidated into the instant action.  (Dkt. 71).  On February 16, 2022, Plaintiffs filed a verified consolidated complaint.  (Dkt. 72).

On March 4, 2022, the Court entered a Case Management Order upon consent of the parties, whereby limited discovery was to be completed prior to the filing of certain

motions to dismiss. (Dkt. 74). The Court's Case Management Order further set forth a procedure whereby certain motions to dismiss would be served by April 15, 2022, but the moving party was to file on CM/ECF only a copy of the cover letter serving the motion, which was to be designated as a letter. (*Id.*). Only upon close of the limited, threshold discovery were the motions to dismiss to be filed on CM/ECF. (*Id.*).

Consistent with the Court's Case Management Order, the pending motions to dismiss (and their supporting papers) were filed on CM/ECF on September 30, 2022. (Dkt. 100; Dkt. 101; Dkt. 102; Dkt. 103; Dkt. 104; Dkt. 105). Responding papers were filed on November 14, 2022. (Dkt. 111; Dkt. 112; Dkt. 113). Replies were filed on December 23 and 27, 2022. (Dkt. 120; Dkt. 121; Dkt. 122; Dkt. 123).

On February 8, 2023, the Court received from Plaintiffs' counsel a letter seeking to "correct a mistake of fact made in their Verified Consolidated Stockholder Derivative Complaint (ECF No. 72) . . ., and repeated in Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss, or in the Alternative, For Summary Judgment (ECF No. 113) . . . and Plaintiffs' Local Rule 56(A)(2) Opposing Statement to Nominal Defendant Eastman Kodak Company's Statement of Undisputed Material Facts and Statement of Facts Believed to be in Dispute . . . (ECF No. 111)." (Dkt. 126). Plaintiffs' counsel explained that "Plaintiffs' Complaint ¶ 147 quotes 'Defendants' Answer, Affirmative Defenses and Verified Counterclaims and Third-Party Claims' in the *White Energy* matter [*Standard General Master Fund L.P., et al., v. White Energy Holdco, LLC, et al.,* No. 2017-0561-JRS (Del. Ch. 2017)], which states that in that matter, 'Akin Gump represented Mr. Continenza.' The Complaint refers to this filing, which is attached as Exhibit 3 to my

Declaration (ECF No. 112), as 'verified.' Complaint ¶ 241. In fact, while the 'Counterclaims and Third-Party Claims' were verified, the 'Answer' was not. Therefore Plaintiffs' references to the answer as 'verified' and 'sworn' in the Opposition, at 21-22, 23, 44, and 64, were factually incorrect." (*Id.*).

Thereafter, the Court entered a Stipulation and Order allowing for the filing of a corrected complaint. (Dkt. 128). This Stipulation and Order provides that the filing of a corrected complaint will not impact the pending motions to dismiss. (*Id.* at ¶ 2). The operative consolidated complaint (that is, the corrected complaint) was filed on March 1, 2023. (Dkt. 129).

The consolidated complaint contains the following causes of action: (1) a claim for violation of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder against the CNG Committee and the Option Recipients; (2) a claim for violations of § 14 of the Exchange Act and Rule 14a-3(a)(1) promulgated thereunder against Continenza; (3) a claim for breach of fiduciary duty against Continenza; (4) a claim for breach of fiduciary duty against Katz, Bradley, and New; (5) a claim for breach of fiduciary duty against the Option Recipients; (6) a claim for unjust enrichment against the Option Recipients; and (7) a claim for unjust enrichment against Karfunkel. (*Id.* at ¶¶ 281-315).

The Court heard oral argument on the pending motions on August 9, 2023, and reserved decision. (Dkt. 134).

## DISCUSSION

### I.   Kodak's Motion to Dismiss or for Summary Judgment

#### A.   Legal Standard

Kodak has moved for dismissal or, in the alternative, for summary judgment, in reliance on the New Jersey Business Corporation Act ("NJBCA"), N.J.S.A. 14A:3-6.3, 14A:3-6.5.   A discussion of the applicability and procedural requirements of this state statute is necessary before the Court turns to the merits of Kodak's motion.

A shareholder derivative action, such as this one, "permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties." *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004) (quotation omitted).   "Since claims asserted in a shareholder derivative suit belong to the corporation, it is incumbent upon shareholder plaintiffs to make a demand upon the corporation's board of directors prior to commencing an action." *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 273 (S.D.N.Y. 2006).   "Pre-suit demand requirements . . . are governed by the law of the state of incorporation[.]" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. V. Lundgren*, 579 F. Supp. 2d 520, 528 (S.D.N.Y. 2008) (citation omitted); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991) (explaining that state substantive law applies "[b]ecause the contours of the demand requirement—when it is required, and when excused—determine who has the power to control corporate litigation").

Kodak is a New Jersey corporation with its principal place of business in Rochester, New York.   (Dkt. 129 at ¶ 30).   Accordingly, and as the parties agree, New Jersey law

governs the pre-suit demand requirements in this action. The NJBCA "categorically require[es] shareholders to make a pre-suit demand on a corporation prior to filing a derivative suit," *Hirschfeld v. Beckerle*, 405 F. Supp. 3d 601, 606 (D.N.J. 2019), unless the corporation opts out of the requirement in its certificate of incorporation, which Kodak has not. *See* N.J.S.A. 14A:3-6.3. Further, the NJBCA provides that a corporation's board of directors may determine whether maintenance of a derivative proceeding would be in the corporation's best interest, or may delegate that authority to a "committee consisting of one or more independent directors appointed by majority vote of independent directors." N.J.S.A. 14A:3-6.5(2)(b). Where such a committee rejects a shareholder litigation demand, a shareholder may maintain a derivative action only if his or her complaint "allege[s] with particularity facts establishing that a majority of the board of directors, or all members of a committee, which in either case determined the matter, did not consist of independent directors at the time the determination was made." *Id*. 14A:3-6.5(3).

If the shareholder satisfies this standard, the corporation may nevertheless seek dismissal by making a "written filing with the court setting forth . . . facts to show: (i) whether or not a majority of the board of directors was independent at the time of the determination . . . ; and (ii) that the independent director or directors made the determination [*i.e.*, to reject the shareholder's demand to commence litigation] in good faith after conducting a reasonable inquiry upon which the conclusions are based." *Id.* 14A:3-6.5(5)(a)(i)-(ii). The NJBCA sets forth different burdens of proof on such a motion to dismiss, depending on whether the majority of the board of directors was independent at the time of the challenged determination. *Id*. 14A:3-6.5(4). If the majority of the board

- 17 -

was independent (as defined by New Jersey law), then the shareholder plaintiff bears the burden of proving that the determination to reject his or her demand was not made "in good faith, after conducting a reasonable inquiry." *Id*. 14A:3-6.5(1)(a). If the majority of the board was not independent, the corporation bears the same burden. *Id*. 14A:3-6.5(4).

In *Halebian v. Berv*, 644 F.3d 122 (2d Cir. 2011), the Court of Appeals for the Second Circuit had occasion to consider the interplay between the Federal Rules of Civil Procedure and a provision of Massachusetts law, Mass. Gen. Laws ch. 156D, § 7.44, that is largely identical to the relevant provisions of the NJBCA. The *Halebian* court explained that the relevant Massachusetts statute (§ 7.44) "sets forth both substantive standards for adjudicating the effectiveness of a board's rejection of a demand and instructions regarding the procedure by which that rejection must be communicated to—and its validity established before—a court," and "does not easily fit within the constraints of [Federal] Rule [of Civil Procedure] 12(b)(6), even as it has been broadened by occasional judicial glosses on its terms." 644 F.3d at 130. "Insofar as the section 7.44 procedure encourages or requires the parties to submit, and under which it is expected that the court will review, evidentiary materials outside the scope of what the plaintiff has already included or incorporated into his or her complaint, the section 7.44 procedure appears to be incompatible with a federal court's limited powers to grant a Rule 12(b)(6) motion to dismiss." *Id*. at 132. As such, the Second Circuit instructed the district court on remand "to adjudicate the claim within the framework of summary judgment[.]" *Id*.

In its motion, Kodak—relying on an unpublished New York trial court case—suggests that the Court could properly consider outside material on a motion to dismiss

made pursuant to the NJBCA, because its provisions are substantive. (*See* Dkt. 100-33 at 24-25 n.10 (citing *Rotz v. Van Kampen Asset Mgmt.*, Index No. 651060/2010, 2014 WL 5431156, at *6 (Sup. Ct., N.Y. Cnty. Oct. 22, 2014))); *see also* Dkt. 123 at 6 (arguing in reply that "Courts evaluate N.J.S.A. 14A:3-6.5(5) motions under both Rule 12(b)(6) and Rule 56, as such motions are 'unique,' and it is within the court's discretion to determine which Rule applies."). Plaintiffs, on the other hand, argue that "as in *Halebian*, this Court should apply the requirements of Fed. R. Civ. P. 56 in assessing whether the requirements of the [NJBCA] have, or have not, been satisfied so as to require dismissal of this case." (Dkt. 113 at 50).

The Court is unpersuaded by Kodak's argument, which it views as foreclosed by the Second Circuit's decision in *Halebian*. Kodak's assertion in reply that "[c]ourts evaluate N.J.S.A. 14A:3-6.5(5) motions under both Rule 12(b)(6) and Rule 56" is not supported by the case law it cites. In particular, Kodak again cites the unpublished *Rotz* case, which it describes as "evaluating NJBCA motion under CPLR 3211(a)(7), equivalent to Rule 12(b)(6)." (Dkt. 123 at 6-7). In other words, Kodak has not actually cited any cases in which a court applied Rule 12(b)(6) to a motion under the NJBCA. Moreover, this Court is bound by the rulings of the Second Circuit with respect to the application of the Federal Rules of Civil Procedure. Accordingly, the Court will treat Kodak's motion as a motion for summary judgment under Federal Rule of Civil Procedure 56.

The parties also devote portions of their briefs to arguing over the relationship between the burden of proof specified by the NJBCA and Rule 56. Plaintiffs "acknowledge that they have the burden pursuant to § 14A:3-6.5(4) to refute Defendants' arguments

regarding the adequacy of both the Special Committee and the Second Committee investigations," but argue that the Rule 56 standard still places the burden on Kodak to show the absence of any genuine dispute as to a material fact. (Dkt. 113 at 50). In reply, Kodak argues that "Plaintiffs cannot evade or re-shift their burden back to Kodak simply because Rule 56 is involved," and that "[b]urden-shifting provisions similar to and including those in the NJBCA are substantive, not procedural, and thus apply whether a motion is considered under Rule 12(b)(6) or Rule 56." (Dkt. 123 at 7-8).

Kodak is correct that "[a] burden of proof . . . 'is a rule of substantive law.'" *Howard Univ. v. Borders*, 588 F. Supp. 3d 457, 472 (S.D.N.Y. 2022) (quoting *Director, Office of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 271 (1994)). The Court explored this issue at oral argument, and Plaintiffs took the position that the Court must, pursuant to the NJBCA, make its own factual findings. Plaintiffs' position is consistent with the language of the NJBCA, which explicitly empowers the Court to make findings regarding the good faith of the board or special committee and the reasonableness of the inquiry. *See* N.J.S.A. 14A3-6.5(1). Further, the parties agreed that the factual record regarding the relevant issues is complete and that no further discovery on these issues can or should be ordered. The Court accordingly concludes that while Rule 56 provides the procedural vehicle by which this motion has come before the Court, the Court is empowered to make findings with respect to whether the Board's decision not to pursue the claims set forth in this matter was made in good faith and after conducting a reasonable inquiry.

**B.**     **Viability of Plaintiffs' Claims under the NJBCA**

Turning to the merits of Kodak's motion, Plaintiffs identify two reasons they should be permitted to pursue their claims:  (1) "while the [Special Committee] Report may have concluded that Plaintiffs' claims lacked merit, neither the Special Committee nor the independent directors of the full Board ever took the required 'vote' to determine that maintaining Plaintiffs' derivative proceeding was not in the best interests of Kodak"; and (2) "the initial Special Committee investigation was neither done reasonably nor in good faith: (i) the [Special Committee's] decision to hire Continenza's longtime counsel Akin Gump tainted the entire investigation; and (ii) the [Special Committee] ignored key facts regarding what MNPI Continenza knew when he made his June Trades, and misrepresented the key fact that Continenza had not precleared his trades in accordance with company policy." (Dkt. 113 at 53 (internal quotation marks omitted)).  The Court considers each of these arguments below.

The Court further notes that while the consolidated complaint alleges that Parrett and New, the two members of the Special Committee, were not independent (Dkt. 129 at ¶¶ 158-161), and Kodak argues to the contrary in its motion (*see* Dkt. 100-33 at 29-32), Plaintiffs did not advance this theory in their opposition.  At oral argument, Plaintiffs confirmed their concession that Parrett and New met the requirements for independence under the NJBCA.

**1.**     **Vote Requirement**

Plaintiffs first argue that, under the NJBCA, either a special committee or the independent directors must affirmatively vote that maintenance of a shareholder derivative

suit is not in the best interests of the corporation, and that no such vote ever took place here. (Dkt. 113 at 53-54). Kodak argues in reply that "the Board voted to reject the maintenance of the derivative proceeding when it voted to adopt the recommendations and conclusions of the [Special Committee] and its 2020 Report and resolved to implement the recommendations as promptly as practicable on September 14, 2020." (Dkt. 123 at 21 (quotations omitted)). The Court further notes that the Second Committee Report expressly recommends "that the Committee conclude that the complaints be dismissed in their entirety as not in the Company's best interests and report to and recommend to the Board that the Company take all appropriate steps to dismiss all related derivative lawsuits." (Dkt. 72-6 at 77). On October 22, 2021, the Second Committee conducted a telephonic meeting at which it unanimously voted to adopt the Second Committee Report. (Dkt. 135-18 at 21).

The parties' dispute in this regard is a technical one regarding the requirements of the NJBCA. The parties have cited no case law addressing this specific issue, and the Court has found none in its own research. Accordingly, the Court focuses on the text of the statute itself. The NJBCA states that a shareholder derivative proceeding "shall be dismissed by the court on motion by the corporation if the court finds" either that the board or special committee "has determined in good faith, after conducting a reasonable inquiry upon which its conclusions are based, that the maintenance of the derivative proceeding is not in the best interests of the corporation" or that a defined group of shareholders has "voted to terminate the derivative proceeding." N.J.S.A. 14A:3-6.5(1)(a), (b). It further provides that the determination regarding whether maintenance of the derivative

- 22 -

proceeding is in the best interests of the corporation shall be made by either "a majority vote of independent directors present at a meeting of the board of directors if the independent directors constitute a quorum" or "a majority vote of a committee consisting of one or more independent directors appointed by majority vote of independent directors, or one independent director if the board consists of only one independent director, present at a meeting of the board of directors, regardless of whether those independent directors constitute a quorum of the board." *Id*. 14A:3-6.5(2)(a), (b).

The question before the Court is thus whether the Board's September 2020 vote to adopt and implement the recommendations and conclusions of the Special Committee and the Special Committee Report constitutes a determination that maintenance of the instant derivative proceeding is not in the best interests of the corporation. The Court finds that it does. The Court's conclusion is driven in part by the distinction between subsections (a) and (b) of N.J.S.A. 14A:3-6.5(1). Plaintiffs argue, essentially, that the "determination" required by subsection (a) must take the form of a vote specifically not to commence or continue litigation, and that a vote addressed to the merits of the claims asserted in the derivative proceeding will not suffice. The language of subsection (a) does not support this narrow reading. Moreover, the language of subjection (b) makes clear that the drafters of the NJBCA knew how to draft a provision strictly dictating the form a vote must take. The broader phrasing of subsection (a) cuts against the conclusion that it likewise requires a vote specifically addressed to the matter of litigation, and not a vote considering more broadly the merits of the asserted claims. *See generally Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004) (setting forth "usual rule" that "when the legislature uses certain

- 23 -

language in one part of the statute and different language in another, the court assumes different meanings were intended" (citation omitted)).  In other words, the Court agrees with Kodak that the language of the NJBCA does not "require[] that a board or committee . . . formally convene and conduct a vote to reject by name each and every shareholder demand, rather than [rejecting] the substance of the proffered derivative claims."  (Dkt. 123 at 22).

It is clear that the Board, by vote, rejected the substance of the claims asserted in this action.  The Special Committee was expressly directed to determine "whether any of Kodak's officers, directors, or senior management engaged in misconduct or illegal activity in connection with any trading or transfers of Kodak stock, including the June Trades, the Karfunkel charitable donation of stock, and the Marx and Southeastern activity; the July 2020 options awards; and the DFC Announcement."  (Dkt. 1-2 at 12).  Kodak's Board thereafter, by vote, adopted the Special Committee Report's conclusion that "Kodak, and its officers, directors, and senior management did not violate the securities regulations or other relevant laws, engage in a breach of fiduciary duty, or violate any of Kodak's internal policies and procedures."  (*Id*. at 8).  Plaintiffs' argument that the Court should not view this vote as a determination that maintenance of the instant derivative action would not be in Kodak's best interest defies logic; it cannot possibly serve a corporation's interest to pursue non-meritorious claims against its own executives and board members.  The Court does not find that the NJBCA required the Board to word its determination in the highly specific manner argued by Plaintiffs.

Moreover, the adequacy of the Board's September 2020 vote is not dispositive of the issue.  Even if the Board's September 2020 vote was insufficiently specific to satisfy the requirements of the NJBCA, the Second Committee's unanimous October 2021 vote clearly did not lack specificity, and appears to independently satisfy the voting requirement of N.J.S.A. 14A:3-6.5.  Indeed, Plaintiffs concede that the Board delegated to the Second Committee the decision to evaluate their demands and that the Second Committee took a vote not to maintain the derivative litigation.  (Dkt. 135-19 at 54-55).  Plaintiffs make no substantive argument as to why the Second Committee's vote is insufficient to satisfy the statutory requirement.  The Second Committee's October 2021 vote is an independent and adequate basis to reject Plaintiffs' contention that the NJBCA's vote requirement has not been satisfied.

## 2.    Reasonableness and Good Faith of the Investigation

The Court next considers whether the Special Committee acted in good faith and conducted a reasonable investigation.  In performing such a review, "the court's inquiry is not into the substantive decision of the board, but rather is into the procedures employed by the board in making its determination."  *In re PSE & G S'holder Litig.*, 173 N.J. 258, 291 (2002) (quotation omitted).  Further, "there is no prescribed procedure that a board must follow."  *Id*. (quotation omitted).  "One of a board's prerogatives in this context is to entrust its investigation to a law firm."  *Id*. at 292 (quotation and alteration omitted).

As previously noted, Plaintiffs contend that the investigation in this case was neither reasonable nor in good faith because "(i) the [Special Committee's] decision to hire Continenza's longtime counsel Akin Gump tainted the entire investigation; and (ii) the

[Special Committee] ignored key facts regarding what MNPI Continenza knew when he made his June Trades, and misrepresented the key fact that Continenza had not precleared his trades in accordance with company policy." (Dkt. 113 at 53 (internal quotation marks omitted)).  The Court disagrees, for the reasons that follow.

### a.  <u>Akin Gump was not Fatally Conflicted</u>

The New Jersey Supreme Court has held that a law firm retained to investigate a potential claim cannot have "a disabling conflict that would have tainted its investigation." *In re PSE & G*, 173 N.J. at 292.   It is not necessary that the Court "condone all aspects of the Board's decision-making process or the role played by the . . . firm." *Id*.  Having briefly served as both investigator and litigation counsel at the same time is not in and of itself a fatal conflict.  *Id*. at 292-93 ("Although the Kasowitz firm needlessly risked creating a conflict by briefly assuming a dual role as the Board's investigator and litigation counsel, the critical question is whether defendants demonstrated bad faith or acted unreasonably in relying on that firm's investigation.").

Plaintiffs argue that Akin Gump had a disabling conflict because it represented Kodak on related matters and had previously been Continenza's personal counsel.  More particularly, Plaintiffs contend that: on July 29, 2020, Kodak retained Akin Gump to represent it "in the face of intense media and governmental scrutiny resulting from the disclosure of the . . . options" granted in July 2020; Akin Gump appeared in the State Court Action after the Second Committee had already hired counsel, seeking an extension of time for Defendants to respond; "Continenza stated . . . that Akin Gump was his counsel in the White Energy matter"; Akin Gump briefly represented Continenza in *Tang v. Eastman*

*Kodak Co.*, No. 6:21-cv-6418 (D.N.J.) (the "*Tang* Matter"), a securities litigation matter arising from the same factual nexus as the instant case[3]; and "Akin Gump was retained on multiple occasions to represent companies where Continenza was either an officer or a director—including Kodak itself." (Dkt. 135-19 at 33-39, 57, 58). The Court has considered these alleged conflicts both individually and collectively and concludes that they cannot sustain Plaintiffs' burden of showing a disabling conflict by Akin Gump.

Turning first to the matter of Akin Gump's July 2020 representation of Kodak, contrary to Plaintiffs' assertion that Akin Gump was hired to "to represent the Company and the options recipients in connection with multiple investigations by Congress and the SEC" (*Id*. at 34), there is no evidence in the record before the Court that Akin Gump was retained on behalf of the Option Recipients. Also unsupported by the evidence of record is Plaintiffs' assertion that Akin Gump "prepared and/or presented materials to the DFC, ostensibly for the purposes of convincing it to give Kodak the DFC Loan." (*Id*. at 35). Further, Plaintiffs acknowledge in their papers that Akin Gump was retained because Kodak had "received multiple requests for documents and information from regulators and governmental entities." (*Id*. at 34-35). While Plaintiffs contend elsewhere in their papers that "Akin Gump's job was to establish that no wrongdoing had occurred" (*id*. at 57), they cite no evidence for this assertion, and there appears to be no such evidence in the record. The Court sees no disabling conflict in Akin Gump having represented Kodak itself—and not the Option Recipients or other individual defendants—for purposes of responding to

---

[3]     The *Tang* Matter was eventually transferred to this Court and consolidated into the *In re Eastman Kodak Co. Securities Litigation* matter.

governmental inquiries prior to being retained by the Special Committee. *See Palkon v. Holmes*, No. 2:14-CV-01234 SRC, 2014 WL 5341880, at *4 (D.N.J. Oct. 20, 2014) (finding no disabling conflict of interest where law firm that investigated shareholder demands had previously represented the corporation in an action brought by the Federal Trade Commission, explaining that the law firm "did not have multiple, conflicting duties" because "its obligations in the FTC and shareholder matters were identical: it had to act in [the corporation's] best interest").

The Court next considers the argument that Akin Gump "appeared in the State Action after the Second Committee had already hired counsel, seeking an extension of time for Defendants to file responses." (Dkt. 135-19 at 58 (citation omitted and emphasis added)). The evidence of record does not support this contention. What the evidence shows is that on September 24, 2021, Nixon Peabody LLP, "along with co-counsel Akin Gump," filed a request for an extension of time to respond to Peters' amended complaint in the State Court Action on behalf of Kodak. (Dkt. 100-10). On that same date, counsel for the individual defendants submitted their own request seeking the same relief on behalf of their clients. (Dkt. 100-11). At a court conference in the State Court Action on September 28, 2021, Akin Gump appeared on behalf of Kodak; the individual defendants were again represented by their own counsel. (Dkt. 100-12). The Court finds no conflict where Akin Gump represented Kodak in the State Court Action after its investigation had been completed and the Board had adopted the Special Committee Report.

Plaintiffs also assert that during the September 28, 2021 conference in the State Court Action, "Akin Gump . . . took the opportunity . . . to prejudge the outcome of the

Second Committee's review[.]"  (Dkt. 135-19 at 58).  This is a misrepresentation of the record.  The transcript of that hearing shows that the Akin Gump attorney who presented oral argument on behalf of Kodak made clear that the extension was sought to allow the Second Committee "an opportunity to be able to do a thorough review . . .  and make a decision for the corporation and all the shareholders" and that the Second Committee had "authority to do whatever it deems appropriate." (Dkt. 100-12 at 12-13).  The Akin Gump attorney further made clear that Akin Gump was "not advising" the Second Committee and that there was new independent counsel.  (*Id*. at 14).  While he did state that he personally did not see "much of anything" in the new allegations included in the amended complaint "that changes anything," he further stated, "at this point it's not for me to make that decision."  (*Id*. at 24 (emphasis added)).  He later reiterated that he was offering only his personal opinion, stating: "I never said, Your Honor, that the company has formed a view that the additional allegations included in the documents were not considered, doesn't change anything.  I said from my standpoint, that's how I see it, and I don't know what the company will or will not conclude through the second Special Committee." (*Id*. at 31).  Plaintiffs have offered no plausible argument that a single attorney from Akin Gump offering a personal opinion on the viability of the claims in the State Court Action well after the Special Committee Report was finalized creates a conflict, much less a disabling one.

The Court turns next to Akin Gump's alleged representation of Continenza in connection with his service as chairman of the Board of White Energy, Inc. ("White Energy").  The basis for Plaintiffs' assertion that this representation existed is the answer

in the *White Energy* matter, which states that "Akin Gump represented Mr. Continenza and sent documents [related to Continenza's employment agreement with White Energy] to the Board in February 2017." (Dkt. 100-25 at 26). As an initial matter, and as previously explained, while Plaintiffs initially stated that the answer in the *White Energy* matter was verified or sworn, they have since conceded that these statements were erroneous. (Dkt. 126). Accordingly, the Court—as it previously advised the parties—has not considered in its analysis any references to the answer in the *White Energy* matter as having been verified or sworn.

Moreover, one of the attorneys who drafted the answer in the *White Energy* matter has submitted a sworn declaration indicating that the paragraph at issue "is inconsistent with paragraphs 39 and 40 of the Answer, our subsequent interrogatory responses, and my recollection of the facts. To the best of my knowledge, no attorney from Akin Gump personally represented Mr. Continenza in connection with the events relevant to the White Energy Matter or the litigation itself." (Dkt. 100-23 at ¶ 12). Continenza has submitted a sworn declaration confirming that he "did not retain Akin Gump to personally represent [him] in connection with the events relevant to the White Energy Matter or the litigation itself, and I did not compensate Akin Gump for any such representation." (Dkt. 100-27 at ¶ 5). Under the circumstances, the Court does not find the unsworn statement in the *White Energy* answer sufficient to support the conclusion that Akin Gump personally represented Continenza, where sworn statements by those with personal knowledge demonstrate that it was made in error.

With respect to the assertions that "Akin Gump was retained on multiple occasions to represent companies where Continenza was either an officer or a director," and "Continenza also reported having a professional relationship with attorneys . . . [from] Akin Gump arising from their representation of certain companies with which Continenza was affiliated" (Dkt. 135-19 at 38), Plaintiffs have cited to no authority holding that this would create a disabling conflict of interest. It is not uncommon for businesses and the individuals associated with them to form professional relationships with lawyers and law firms, and law firms of course have an interest in cultivating such relationships. However, the existence of a professional relationship does not create the kind of bias that would call into question an attorney's ability to comply with his or her ethical obligations, or otherwise taint the investigation, and Plaintiffs have not identified any cases holding that it does.

Plaintiffs also claim that "[t]here is no record of either the Board or the Special Committee inquiring into Akin Gump's prior relationships with Kodak, Continenza, or others" and that the Special Committee made an "entirely passive decision to hire Akin Gump[.]" (*Id.* at 57). Again, these arguments are not supported by citations to evidence establishing the asserted facts. Moreover, Parrett and New have submitted sworn declarations explaining how and why the Special Committee decided to hire Akin Gump and affirming that the Special Committee was "made aware of Akin Gump's prior work and the July 29, 2020 retention" prior to Akin Gump's retention. (Dkt. 100-14 at ¶¶ 16-17; Dkt. 100-18 at ¶¶ 16-17). Plaintiffs have not identified any evidence controverting these factual representations.

As to the *Tang* Matter, it is undisputed that Akin Gump did briefly appear on behalf of Continenza and Bullwinkle in that action.  Specifically, on September 11, 2020 (after the Special Committee had hired Akin Gump and after Akin Gump had nearly completed its work for the Special Committee), Akin Gump appeared on behalf of Kodak, Continenza, and Bullwinkle "in order to execute and file a stipulation regarding the adjournment of their responses to the complaint, and filed a notice of non-opposition to certain plaintiffs' motion to transfer the case to the United States District Court for the Southern District of New York." (Dkt. 100-29 at ¶ 4).  The record before the Court establishes that Akin Gump did not perform any substantive legal work as to Continenza's defense in connection with the *Tang* Matter.  The purported conflict with respect to the *Tang* Matter thus boils down to Akin Gump having appeared on behalf of Continenza and Bullwinkle for administrative purposes a few days before the Special Committee Report was completed.  While the Court does not view this as a particularly wise course of action, the New Jersey Supreme Court held in *In re PSE & G* that "briefly assuming a dual role as . . . investigator and litigation counsel" does not by itself create a disabling conflict.  173 N.J. at 292-93.  The ministerial work that Akin Gump performed for Continenza in the *Tang* Matter is not sufficient to meet Plaintiffs' burden of showing that the investigation was impermissibly tainted.

*Stepak v. Addison*, 20 F.3d 398 (11th Cir. 1994), does not change the Court's analysis.  *Stepak* was concerned with a law firm's prior representation of "the alleged wrongdoers in proceedings related to the very subject matter that the law firm is now asked to neutrally investigate[.]"  *Id*. at 405.  The *Stepak* court explained that "[t]here is a strong possibility that a 'lingering allegiance' toward the insider defendants will color or

- 32 -

otherwise bias counsel's investigation of the allegations against its former clients, as well as any legal advice counsel provides to the corporation about the matter. This is especially true when the prior representation was in relation to criminal proceedings." *Id*. Moreover, "a law firm that had previously defended the alleged wrongdoers would be hampered in its investigation of the shareholder's allegations by its continuing duty to preserve the secrets and confidences of its former clients." *Id*. at 406. These concerns are not present in this case, where Akin Gump's appearance on Continenza's behalf for administrative purposes only occurred after the Special Committee had hired Akin Gump and after Akin Gump had performed its factual investigation and was in the process of finalizing its report.

*Lewis v. Shaffer Stores Co.*, 218 F. Supp. 238 (S.D.N.Y. 1963), also does not compel a different result. While the *Lewis* court did indicate that under the circumstances of that specific case, "it would be wise for the corporation to retain independent counsel, who have had no previous connection with the corporation, to advise it as to the position which it should take in this controversy," *id*. at 239, it did not hold or suggest that the kind of brief simultaneous representation present in this case would irrevocably taint an investigation.

Again, the Court is not suggesting that it condones Akin Gump having briefly served as both investigator and litigation counsel even in a ministerial fashion. It plainly would have been better practice for Continenza to immediately obtain his own counsel in the *Tang* Matter, no matter how routine the work. But the Court need not "condone all aspects of the Board's decision-making process or the role played by" Akin Gump. *In re PSE & G*, 173 N.J. at 292. Instead, the relevant question is whether Akin Gump had "a disabling conflict that would have tainted its investigation," such that the Special Committee's and

the Board's reliance on Akin Gump's investigation was unreasonable or in bad faith. *Id.*
at 292-93. The record before the Court in this case does not support such a conclusion.

The Court's holding is further supported by the fact that Crowell, an independent
law firm, performed an investigation into whether Akin Gump was conflicted and
concluded that it was not. (Dkt. 72-6 at 3). Crowell specifically concluded that "Akin
Gump conducted an exhaustive and thorough investigation, and there is no evidence to
suggest that its independence was compromised." (*Id.*). Crowell's assessment is further
evidence that it was neither unreasonable nor in bad faith for the Special Committee to
entrust the investigation to Akin Gump.

**b.    The Special Committee's Inquiry was Reasonable**

Plaintiffs further argue that the Special Committee did not perform a reasonable,
good faith investigation, because it reached factual conclusions that Plaintiffs contend are
false, and because it did not conduct a fulsome investigation into Karfunkel's alleged tax
fraud. (Dkt. 135-19 at 61-69). The Court is unpersuaded by these arguments.

The relevant question is whether the Special Committee's inquiry was "so restricted
in scope, so shallow in execution, or otherwise so *pro forma* or half hearted as to constitute
a pretext or sham." *In re PSE & G*, 173 N.J. at 292 (alteration omitted and quoting *Stoner
v. Walsh*, 772 F. Supp. 790, 806 (S.D.N.Y. 1991)). This standard is not even close to being
met here.

Akin Gump was tasked with performing a broad investigation into "whether any of
Kodak's officers, directors, or senior management engaged in misconduct or illegal activity
in connection with any trading or transfers of Kodak stock, including the June Trades, the

Karfunkel charitable donation of stock, and the Marx and Southeastern activity; the July 2020 options awards; and the DFC Announcement." (Dkt. 1-2 at 12). Akin Gump performed a six-week investigation, during the course of which it reviewed over 60,000 documents, conducted 44 witness interviews, collected relevant information from a third-party who was unaffiliated with Kodak, and had unfettered access to Kodak's systems and materials. (*Id*. at 8, 12-13). Akin Gump's document collection process was robust, and included the retention of third-party vendors to assist in the collection and review of electronic communications. (*Id*. at 13-14). The witnesses interviewed included Kodak's "CEO, CFO, General Counsel, Vice President of Government Affairs, Chief Compliance Officer, Controller, members of the public relations team, all members of Kodak's compensation committee, all Board members, and multiple other Kodak employees who were involved in the DFC loan process and the Company's response to the pandemic." (*Id*. at 15). Akin Gump ultimately produced an 82-page, comprehensive report, which included forward-looking recommendations to improve Kodak's corporate governance. "Based on the procedures employed and the seriousness by which" Akin Gump "approached its task," *In re PSE & G*, 173 N.J. at 294, it is clear that the investigation was both reasonable and in good faith.

Plaintiffs' arguments to the contrary are unpersuasive. They contend that the Special Committee "falsely concluded" that Byrd had precleared Continenza's June Trades in compliance with Kodak's insider trading policies, and that this "was not a good faith, reasonable conclusion." (Dkt. 135-19 at 62). They further contend that the Special Committee "ignored material facts" that cast doubt on its conclusion that the DFC loan

application process was at an uncertain stage and viewed as having a low probability of success when Continenza made the June Trades. These arguments are an attack on the substance of the Special Committee's conclusions, which is not the focus of the Court's inquiry under the NJBCA. *In re PSE & G*, 173 N.J. at 291 ("Our next inquiry focuses on whether the Board acted in good faith and with due care in investigating the merits of the litigation. . . . [T]he court's inquiry is not into the substantive decision of the board, but rather is into the procedures employed by the board in making its determination." (internal quotation marks omitted)). The fact that the Special Committee allegedly made a factual error in its report and weighed the evidence differently than Plaintiffs believe it should have been weighed is not sufficient to demonstrate a lack of good faith or to call into question the reasonableness of the investigation.

In support of their position, Plaintiffs rely heavily on *London v. Tyrrell*, No. CIV.A. 3321-CC, 2010 WL 877528 (Del. Ch. Mar. 11, 2010), in which the court held that "if the [investigating committee] gets the undisputed facts wrong in its report, and then relies on its erroneous recitation of the undisputed facts in making its dismissal recommendation," the basis for the committee's recommendation is not reasonable. *Id*. at *17. However, and as Kodak correctly points out, the *London* court was applying the test articulated in *Zapata Corporation v. Maldonado*, 430 A.2d 779 (Del. 1981). The *Zapata* test specifically instructs a reviewing court to inquire into the bases for the committee's conclusions. *Id*. at 788-89. The *Zapata* test does not govern the Court's inquiry under the NJBCA, which— as previously noted—is concerned with process and not with the substance of the determinations.

Unlike the court in *London*, which was applying the *Zapata* standard, the court in *Sojitz Am. Cap. Corp. v. Kaufman*, 141 Conn. App. 486 (App. Ct. of Conn. 2013), was applying a Connecticut statute that, like the relevant provisions of the NJBCA, was derived from § 7.44 of the Model Business Corporation Act. The *Sofitz* court explained that under the relevant standard, "the court may conduct a limited review into the board's conclusions to determine that they follow logically from the inquiry, but may not scrutinize the reasonableness of its determination." *Id*. at 509. "[T]he policy reason for this limited review is that a corporation should be free to determine in its own business judgment whether litigation is in its best interest, free from unnecessary interference." *Id*. at 506 (citation omitted). Nothing in the record before the Court suggests that the conclusions reached by the Special Committee were not based on the investigation or otherwise failed to meet the relevant standard.

The Court does not suggest that pervasive, serious factual errors in a report could not call into question the validity of the investigatory process. However, that is not what Plaintiffs have identified here. Instead, they have identified a single factual error, and an alleged omission of a handful of facts related to the status of the DFC loan application in June of 2020 that Plaintiffs view as material but that the Special Committee did not. This is insufficient to demonstrate that the investigatory process was pretextual or a sham.

Plaintiffs next contend that the Special Committee, via Akin Gump, did not adequately investigate Karfunkel's purported gift to Chemdas Yisroel. (Dkt. 135-19 at 65). According to Plaintiffs, "[t]he Special Committee's choice not to conduct a fulsome investigation into Karfunkel's tax fraud is evidence of its lack of a reasonable, good faith

investigation." *Id*. The Court again disagrees. The Special Committee Report indicates that Akin Gump interviewed both Karfunkel and Byrd regarding the gift, and concluded based on those interviews that Karfunkel's gift could not be considered insider trading. (Dkt. 1-2 at 72-73). Akin Gump reasonably focused its investigation on whether Karfunkel's gift constituted insider trading, rather than the *bona fides* of the charity and the gift or the potential tax implications. It is natural and reasonable for the Special Committee and its counsel to have concerned themselves primarily with the corporate governance implications of Karfunkel's actions, and any potential damage to Kodak that could flow therefrom, as opposed to potential tax malfeasance that would be the concern of the Internal Revenue Service.

In sum, the record before the Court establishes that Kodak's Board determined in good faith and after a reasonable inquiry that maintenance of the claims asserted in this action would not be in Kodak's best interest. Dismissal of this action pursuant to the NJBCA is accordingly mandated, and Kodak's motion seeking the same is granted. The remaining motions seeking dismissal of the claims on the merits are denied as moot.

## CONCLUSION

For the foregoing reasons, the Court grants Kodak's motion to dismiss or for summary judgment (Dkt. 100) to the extent that it grants summary judgment on all of the claims set forth herein pursuant to the NJBCA. The Court denies the other pending motions to dismiss (Dkt. 101; Dkt. 102; Dkt. 103) as moot. The Clerk of Court is directed to enter judgment and close the case.

SPA-39

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: September 25, 2023
      Rochester, New York

SPA-40

AO 450 (Rev. 11/11)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
## for the

Western   District of   NY

)
)
*In re EASTMAN KODAK COMPANY* )
*DERIVATIVE LITIGATION* )   Civil Action No.   21-CV-6621 EAW
)
)

# JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____ _____ .

☒ other:   Kodak's motion to dismiss or for summary judgment is granted to the extent that it grants summary judgment on all of the claims set forth herein pursuant to the NJBCA. The Clerk of Court is directed to enter judgment and close the case. _____ .

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

☒ decided by Judge   Elizabeth A. Wolford _____ on a motion for dismissal or for summary judgment in favor of Kodak. _____ .

Date:   09/26/2023 _____   CLERK OF COURT

_____
Signature of Clerk or Deputy Clerk